SEHR et al., Appellants, v. LINDEMANN, et al.

Division One, December 22, 1899.

1. **Will:** CONTEST: PROOF OF EXECUTION, ETC. When a will is contested it devolves upon the proponents to prove its execution, and that the testator was of the requisite age and sane. This makes out a *prima facie* case, and it then devolves on the contestants to establish his incompetency and undue influence.

2. ———: ———: COMPETENCY. By competency in a testator is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it, and the persons or objects he makes the beneficiaries of his bounty. If he have sufficient intelligence remaining to fulfill this definition, imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions, or requiring a repetition of information, will not be sufficient to establish his incompetency. Such incompetency is not shown by the facts in this case.

Sehr v. Lindemann.

3. ———: ———: ———: CHILDISHNESS, ETC.: OPINIONS. Mere opinions of witnesses that the testator was "childish" or acted "funny" or was "worse than a child" or that there were "inequalities in the will," unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator knew what he was doing and to whom he was giving his property.

4. ———: ———: UNDUE INFLUENCE. Undue influence in a contest to set aside a will is such influence as amounts to force, coercion or over-persuasion which destroys the free agency and will-power of the testator. And affirmative proof of such undue influence is required to be made either by direct facts shown, or by facts and circumstances from which undue influence results, as a reasonable and fair inference, and not a mere conjecture. Such undue influence was not shown by the facts in this case.

5. ———: ———: QUESTION FOR JURY. If there is any substantial evidence of testator's incompetency to make a will or that he was induced by undue influence, the question of whether the will is to be set aside should be submitted to the jury; otherwise, it is the duty of the court to direct a verdict for the proponents.

6. ———: ———: CASE RENEWED: PEREMPTORY INSTRUCTION. The evidence in this case is reviewed, and it is held that the charge of incompetency was not established by the testimony, nor was the proponent's *prima facie* case overcome nor did the court err in directing a verdict for them.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Talty*, Judge.

AFFIRMED.

*Rassieur & Buder* for appellants.

The court erred in giving the peremptory instruction at the close of plaintiff's case, for the following reasons: (1) Where, as in this case, a testator unjustly discriminates against three of his children and in favor of those who lived with him and were entrusted with the management and control of his business and had access to his moneys, together with the other facts of his old age, blindness and general debility and inability to write, sufficient has been shown to cre-

ato an inference that undue influence was exerted by the remainder of his family who received the greater portion of his estate.   Gay v. Gillilan, 92 Mo. 264; Maddox v. Maddox, 114 Mo. 46; Bush v. Bush, 87 Mo. 480; 1 Redf. on Wills, 516, 537; Lynch v. Clements, 24 N. J. Eq. 431; McFadin v. Catron, 120 Mo. 271.   (2)   Where, as in 'this case, there is any substantial evidence that the testator was not of disposing mind and memory at the time of the execution of the will, the case should go to the jury.   Fulbright v. Perry Co., 145 Mo. 432; Young v. Ridenbaugh, 67 Mo. 574; Hudson v. Adams' Admr., 49 S. W. Rep. 192.   (3)   Because, according to the testimony offered by plaintiffs, several of the defendants made admissions and declarations as to the unsoundness of mind of the testator about the time the will was executed, and before.   These declarations are binding on all the defendants and made out a *prima facie case*.   Armstrong v. Farrar, 8 Mo. 629; Allen v. Allen, 26 Mo. 332.   (4)   So, also, on account of the proof by witness J. P. Webber of the declaration. of defendant Mathias Lindemann, showing his undue influence over the mind of the testator.   Although, according to the evidence, he was pleased at all times to see his daughter, the son and half-brother had forbidden her access to the place.   Jackson v. Hardin, 83 Mo. 175.   (5)   In a statutory contest of a will, when a *prima facie* case is made by the proponents, the cause should be submitted to the jury, even though no evidence is offered by contestants.   Walton v. Kendrick, 122 Mo. 504.

*Clinton Rowell* for respondents.

The court properly sustained the defendants' demurrer to the evidence, because:   (1)   There was no substantial evidence tending to show want of testamentary capacity.   Fulbright v. Perry Co., 145 Mo. 432; McFadin v. Catron, 138 Mo. 197; Cash v. Lust, 142 Mo. 630; Jackson v. Hardin, 83 Mo. 175; Riley v. Sherwood, 144 Mo. 354; Wilson v. Mit-

chell, 101 Pa. St. 502; Holmberg v. Phillips, 78 N. W. Rep.
66; Von de Veld v. Judy, 143 Mo. 348. (2) There was no
substantial evidence tending to show undue influence. Ber-
beret v. Berberet, 131 Mo. 399; McFadin v. Catron, 138 Mo.
197; Riley v. Sherwood, 144 Mo. 354; Jackson v. Hardin,
83 Mo. 185; Doherty v. Gilmore, 136 Mo. 414; Carl v. Ga-
bel, 120 Mo. 283; Cash v. Lust, 142 Mo. 630; Aylward v.
Briggs, 145 Mo. 604; Messmer v. Elliott, 184 Pa. St. 41.
(3) The testimony of Joseph Schnieders was properly ex-
cluded because he was the husband of one of the plaintiffs.
R. S. 1889, sec. 8922; Joice v. Branson, 73 Mo. 28; Paul v.
Leavitt, 53 Mo. 595; Wood v. Broadley, 76 Mo. 23; Calla-
han v. Billat, 68 Mo. App. 435.

MARSHALL, J.—The statement of this case made by
respondent is plain, impartial and full and we accordingly
adopt it. It is as follows:

RESPONDENT'S STATEMENT.

"The proceeding is one to contest the validity of the will
of Herman Lindemann, deceased. The validity of the will
is assailed on the ground of the want of testamentary capacity
of the testator, and of the exercise of undue influence over
him by defendants. The charge of undue influence was not
in the original petition; it was created by an amendment after
the trial had progressed for a considerable time. The plain-
tiffs are the three children of the testator by his first marriage,
and the defendants are his surviving widow and his four
children by her. At the close of the plaintiff's case, the court
instructed the jury to find a verdict for the defendants, which
was accordingly done.

"The will was executed on April 22, 1893, having been
drawn on that day by Mr. Gerhard F. Muessman, assisted by
Mr. J. H. Zumbalen, both attorneys-at-law, and was wit-

nessed by these gentlemen.    The testator died on June 7, 1896.

"It appeared from the testimony that the testator, Hermann Lindemann, had, for nearly fifty years, been a market gardener in a small way, on a tract of land, about nineteen acres, on Meramec street, three blocks west of Grand avenue, in the southwestern part of St. Louis. He was twice married, and had three children, the plaintiffs, by his first wife.    Seven or eight years after her death, he married his step-daughter, who is the surviving widow.    By her he had two sons and two daughters, who, with their mother, are the defendants.

"The plaintiffs left the paternal roof some twenty-two or twenty-six years before the will was made, married, and raised families of their own.    They were opposed to their father's marriage with his step-daughter, thought that marriage was wrong and illegal, and repeatedly expressed this opinion to the testator.    The children of the second wife, who were aged respectively 32, 29, 25 and 19 years at the time the will was made, remained at home, unmarried, and assisted the testator in carrying on his gardening business, the girls, as well as the boys, working in the field.    For years before the testator's death he did no manual labor on the place himself, but simply directed the work of these children, who continued thus to labor for him until his death.

"The circumstances attending the drawing and execution of the will, as testified to by the attesting witnesses thereto, are that, on April 21, 1893, defendant Mathias Lindemann called at the office of Gerhard F. Muessmann, an attorney, and stated that his father, the testator, was ill and wished Mr. Muessmann to call upon him and do some writing. Mr. Muessmann had known the testator for nearly twenty-five years and had done work for him before.    On the next day, April 22, Mr. Muessmann went to the Lindemann house, Mr. Zumbalen accompanying him at his request.    They got

there about nine o'clock in the morning, and, being shown into testator's room by his wife, found him in bed. Mr. Zumbalen thus details what took place: 'He (testator) said to Mr. Muessmann that he had sent for him to make his will. We spoke in German entirely. Mr. Muessmann asked him to give the names of all his children and their ages. Mr. Lindemann said that he had been twice married and that he had three children by his first wife, and gave us their names. He said his first wife's name was Clara; her maiden name was Voss. He said he had four children by his second wife, and he stated their names and their ages. I think he was asked by Mr. Muessmann specifically for their ages, and he stated their ages. Then Mr. Lindemann asked Mr. Muessmann whether it was incumbent on him, under the laws of Missouri, to divide his property among his children, or what rights he had as the owner of the property. Mr. Muessmann told him that it was necessary for him to mention all of his children in the will, but that he could give them what he chose, or give them nothing if he did not choose to; that he could do with what he owned just as he pleased, provided he mentioned the children in the will. Then Mr. Lindemann said he wished to give the three children of his first wife, Mrs. Von der Haar, Mrs. Schnieders and Mrs. Sehr, $25 each, and that he had two lots in Carondelet, on Davis street, which were of slight value, which he wished to give Mrs. Lindemann absolutely; he said they were of slight value, and that he also wanted Mrs. Lindemann to have all the balance of his property, real and personal, for life, and after her death it should be divided among her children. He said he wanted the son Mathias to have a certain six acres; I have forgotten which direction from the house the tract lay, which Mathias was to have, but at any rate, Mathias was to have a certain six acres of the home place, and the other son, John Joseph, was to have another six acres, which he described as being on the other side of the house, and that the remainder was to go to the

two girls, the children of the present Mrs. Lindemann, in equal shares, after her death. Mr. Muessmann then asked him whether he had ever had a survey made of that tract, so that he could describe the particular tracts which he wished to give the two boys in the will with sufficient accuracy to identify them, and Mr. Lindemann said no, he had never had a survey made; that he had intended having one made, but put it off, and had not done it. Then Mr. Muessmann suggested to him it would be impracticable to make a specific division of any specific part of the tract, on account of the impossibility of describing it sufficiently without a survey, and that he had better give it to them in undivided parts. Then Mr. Muessmann asked him for the deed to the property on Meramec street, where they lived, and he said he could not find it; that he didn't know whether he had it or not. Then Mr. Muessmann asked him whether he could produce the tax bills for that property, and he said yes, and called Mrs. Lindemann and asked her to get them, saying they were in the chest standing beside the bed. She could not open the chest, and called in the son, Mathias, and he succeeded in unlocking it, and finally found the tax bills in it. The testator said he was assessed with more land than he had; that they had assessed him with 21 or 22 acres, whatever it was (I have forgotten what the tax bills showed), and that he had only about 19 acres, and that the division therefore, should be made among the children in nineteenths; that each of the two boys should have, after their mother's death, six-nineteenths of that tract of land, and the remainder, which would be seven-nineteenths, was to be divided by the two daughters of his second marriage. Then Mr. Muessmann asked him whom he wanted to name as executor of his will, and he said his wife should be the executrix. Mr. Muessmann had taken down these directions on a slip of paper, as they were given him, and, after the directions were concluded, I sat down at the table, which was parallel with the head of

the bed and about five or six feet from the bed Mr. Linde-
mann was lying in, and proceeded to draw up the will. Mr.
Muessmarn dictated to me the provisions from the memor-
andum he had taken. While I was engaged in writing the
will, Dr. Schade, testator's physician, was announced. He
was admitted to the room and saw the patient, but stayed only
a few minutes. When I had the will written, Mr. Muess-
mann read it over to Mr. Lindemann, translating it verbatim
into German. When he had finished, Mr. Lindemann said
that that was just as he wanted it. Then Mr. Muessmann
asked him if he was ready to sign it, and he said yes, but he
could not, did not think he could, write his name; that it
was always difficult for him to write, and, being in bed at the
time, he did not think he could succeed in doing it at all, and
he asked me to write his name and said he would make his
mark. I therefore wrote his name to the will, and Mr. Muess-
mann placed the will before him on a book and Mr. Linde-
mann touched the pen while Mr. Muessmann made the cross.
Then Mr. Muessmann asked Mr. Lindemann whether that was
his last will, and he answered, ' Yes, it is.' Mr. Muessmann
asked whether he wished us to sign it as witnesses, and he
(testator) said he did. Thereupon, we witnessed it sit-
ting at the table, in full view of Mr. Lindemann. The
testator sat up in bed but did not get out of it. He said he
was not very well but that he was improving and expected
to be all right in a few days. His voice was clear and strong;
I had no difficulty in hearing him, and he seemed to have no
difficulty in speaking. He appeared to be a strong, healthy
man. There was some general conversation when the doc-
tor came into the room, and I think after the will was exe-
cuted. Some question was asked Mr. Lindemann by Mr.
Muessmann or myself as to how far this tract of land extended
northwardly, and what the name of the street was beyond.
Testator said that his land ran up to the street beyond, which
was called Rebecca street; and he said something about pay-

ing for the will, asked how much it would be, but Mr. Muess-mann said he could settle that when he was able to call at his office.   When the son Mathias was in the room, the testator directed him to get us some wine.   We were there about two hours.   There was a Franciscan friar sitting in the adjoin-ing room when we left.   I never saw the testator except on that occasion.   In my judgment, he was of sound mind at the time he made the will.'

"The other subscribing witness had known the testator since about 1870, had seen him at long intervals, but not for seven or eight years before the making of the will. He testified that the testator was a man of very strong mind and always knew what he was doing; that on the morning when the will was drawn, the testator looked strong and in good health, but said he felt a little feeble and feverish; that he was of sound mind when the will was made.   And he related the circum-stances attending the execution of the will substantially as detailed by the other subscribing witness.

"The plaintiffs offered testimony to show that the testa-tor's sight had been failing for a year or two before the will was made; that at the time it was made he could see but little; that in April, 1893, he had a severe spell of sickness. Plaintiff, Mrs. Sehr, visited the testator the day before the will was made, and again on the day it was made, after it was executed.   She testified that her father was 84 when he died; that when she visited her father on April 21, 1893, he was very sick and  she asked, 'Father how  is it?'  but got  no answer until she asked again, when he said, 'Who is that?' She answered, 'Nettie,' and asked again, 'Papa how are you?' Whereupon he said, 'Oh, Nettie, bad.'   That after awhile she tried to help give him his medicine, but Mrs. Lindemann and Mathias interfered, saying they would do that.   That on April 22, 1893, she again visited her father and asked him twice, 'How is it, father?'   That he moved a little and

looked as if he heard her and murmured a little, but did not answer; he was too weak; that her step-sister, defendant Karolina, then said to her, 'Last night, about 11 o'clock, father was so bad we all thought he died,' and that he was so weak he did not know them any more.  When asked if, in her opinion, her father was of sufficient capacity to make a will on April 22, 1893, this witness answered:  'My father was five years already feeble and childish; I don't think he was strong enough and able to make a will.'  She also testified to a conversation she had with the testator two weeks after the will was made.  She said she had been trying to talk to him for some time, but got no chance; that she had heard he had made a will and willed them nothing; that he said, 'Oh, my child, Nettie; don't talk that  way', and cried like a child; that he always told her he was never willing to make a will, and that the land came from my mother, and so he was willing to give every child alike, and we should not believe other people; that he said, 'They know more than I know myself.'

"Plaintiff, Mrs. Von der Haar, also visited her  father on the morning the will was made.  She testified that she waited with the priest in the adjoining room while the will was being drawn; that after it was drawn the priest went in and talked to her father about a quarter of an hour; and then she went in and said, 'Papa, how is it?'  That she called two or three times, and then he murmured kind of like, he could not talk, and only said, 'Karolina;' that he was sick and weak.  Asked if she believed that her father was at that time of sound mind, she said, 'Well, he was kind of weak-minded, but I can't just say he was out of himself;' that the way she saw it he was not of strong enough mind to understand what property he owned and its value.  She further testified that she again called on the testator two days after the making of the will, and that he then felt better and hoped

to get up in a few days; that she knew the doctor who attended him; that he had been a very strong-minded man, but his mind was then like all old people; that the whole family had to mind and obey him. She also testified to a conversation she had with the testator about two months after the will was made, as follows: '

" 'I went down in the morning and stayed there and tried to talk with father in the house. I couldn't get a chance; they tried that we don't talk with father alone. I said: "Father, I will have to go home; I am here two hours and I would like to speak to you, but I can't; won't you do me the favor to go to the steps with me?" We went fifty feet from the house. I said, "Father, I heard you made the will and did not will us any; that you willed all the property to the rest of the four children." And he said, "Caroline, that is not so; you are just as good as the others, one just as good as the others, and you all have even what it is, the property; shall have even shares. Oh, my God, child, that ain't so; you must not listen at the people, and that is not long ready yet." '

"Mrs. Sehr further testified that in later years her father was 'childish' and 'funny,' in that he asked many questions and repeated the same questions over and over again; that Mr. Lindemann on several occasions before and after the making of the will complained that the testator was 'childish' and 'funny,' and 'worse than a little child,' because he asked so many questions and always wanted his wife about him and was very much trouble to her. She also testified that the testator complained to her several times that the boys were cross to him and cursed him, and that testator, as well as the defendants themselves, told her that they (defendants) tried to prejudice the testator against the plaintiffs but that they did not succeed in doing so. Mrs. Von der Haar also testified that testator several times complained to her that the boys treated him mean and were rough; that whenever she talked to him

he would repeat the same thing over two or three times; that he always treated the plaintiffs kindly and that the defendants, also, always treated them well.

"It further appeared that the plaintiffs were always frequent visitors at the testator's house, at times visiting him two or three times a week; that the defendants encouraged these visits, telling them that the testator was not satisfied unless plaintiffs came to see him often; that testator always treated plaintiffs well, 'like a good father ought to,' and that the defendants did likewise, at least when the testator was around.

"Dr. Upshaw was called in to treat the testator's eyes about four months after the making of the will and then visited him four times; he had seen him once before that. At the time he treated him he thought Mr. Lindemann was failing mentally, but, 'I could not say he was of unsound mind; that is going a good ways, to say he was of unsound mind.' The witness did not think he was capable of fully understanding his ordinary business, but that to some extent he was; that witness did not remember anything testator had said, and that he examined him solely with reference to his eyes and not as to his mental condition.

"Chas. Ditter testified that he knew the testator from 1864 to some time in the '80s and visited him at intervals; that he called upon Lindemann in 1894 or 1895 and, as he could not see, told him he was Ditter, but that Lindemann did not know him and said he did not know anybody anymore.

"J. P. Webber testified that three and a half years prior to the trial, Mathias Lindemann said to him: 'Karolina (Mrs. Von der Haar) was over to-day and we had a little fuss, and I told her to move on out, not to come in our place anymore. I fixed them all right, they have got nothing to say here, I am boss here.' "

## I.

Under the Statute of Wills the owner of property is permitted to dispose of it as he chooses after his death. If he makes no disposition of it by will the Statute of Descents disposes of it for him. When a will is contested it devolves upon the proponents to prove the execution of the will, that the testator was of requisite age and that he was sane. [Harris v. Hays, 53 Mo. 90; Benoist v. Murrin, 58 Mo. 322; Norton v. Paxton, 110 Mo. 456.] This makes out a *prima facie* case, and it then devolves upon the contestants to establish incompetency or undue influence. By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. [Farmer v Farmer, 129 Mo. 530; Berberet v. Berberet, 131 Mo. 399; McFadin v. Catron, 120 Mo. 252; Ibid 138 Mo. 197; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 354; Fulbright v. Perry Co., 145 Mo. 432.] Mere opinions of witnesses that the testator was "childish," or acted "funny," or was "worse than a child," or that there were "inequalities in the will," unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator "knew what he was doing and to whom he was giving his property." [Fulbright v. Perry Co., 145 Mo. 432; Aylward v. Briggs, Ibid 604; Riley v. Sherwood, 144 Mo. l. c. 364; McFadin v. Catron, 138 Mo. 197; Von der Veld v. Judy, 143 Mo. 348].

By undue influence is meant such influence as amounts to force, coercion or over-persuasion which destroys the free agency and will power of the testator.    It is not merely the influence of affection or desire to gratify the wishes of one who is near and dear to the testator.    [McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 366; Fulbright v. Perry Co., 145 Mo. 432; Aylward v. Briggs, Ibid 604.] And "affirmative proof of such undue evidence is required to be made either by direct facts shown, or by facts and circumstances, from which undue influence results, as a reasonable and fair inference and not a mere conjecture." [Doherty v. Gilmore, 136 Mo. 1. c. 420; Riley v. Sherwood, 144 Mo. 354.]    If there is any substantial evidence of incompetency or undue influence the case should be submitted to the jury; otherwise it is the duty of the court to direct a verdict for the proponents.    [Fulbright v. Perry Co., 145 Mo. 432; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Von de Veld v. Judy, 143 Mo. 348; Berberet v. Berberet, 131 Mo. 399; Cash v. Lust, 142 Mo. 630; Defoe v. Defoe, 144 Mo. 458].

The question therefore is have these contestants brought this case within the rules above stated?    There can be no doubt, under the evidence, that the testator knew he was making a will; knew what property he owned and where it was located, and its relative value; knew the names of his first and second wives and the names and ages of the children born to him by each marriage, and knew what disposition he was making of his property.    He therefore clearly came within the *prima facie* rule as to competency.    He was blind and hence could not see to write; he did not remember his old friend Ditter, whom he had seen but once for several years before he was partially deaf; he was sick with intermittent fever and the night before the execution of the will his immediate family thought he would die, but within two weeks

afterwards he was up and lived about three years afterwards; he wanted his wife with him continually and complained if she left the house; he told the children of the first marriage that his second wife and her children had cursed him and been cross to him; his second wife said he was so funny they could not get along with him, that he was worse than a little child and that she could not do much with him, but he had been a very self-willed and even obstinate man all his life; he had married his stepdaughter after the death of his first wife against the earnest protest of the children of the first marriage, and had lived with her for forty years, the children of the second marriage staying at home with him, helping to cultivate the place, while the children of the first marriage had married, had homes and families of their own and had been away from his home for twenty-five years; he told the lawyers who drew his will how much property he owned, how he wanted to leave it; asked if he was obliged to leave it to all his children in equal parts; knew that he was charged taxes on 21 or 22 acres of land when he only owned 19 acres; knew his children and grandchildren when they visited him; and insisted on their coming often and treated them as a father should, and then, after two hours spent in the preparation and execution of his will and the attorneys were about to leave, asked for their bill and wanted to pay it.   But while the children by the first marriage said he was weak-minded, they would not say he was insane, and the doctor, who treated his eyes four months after the will was executed, did not think him just right mentally, but would not say he was not of sound mind.

Clearly, therefore, the charge of incompetency was not established by the testimony, nor the *prima facie* case made out by the proponents overthrown, and there was therefore nothing for the jury to consider and the court did right in directing a verdict for the defendants upon this issue.

The evidence as to undue influence was that the testator said his second wife and children cursed him and were cross to him; that when he was sick about the time of the execution of the will, his wife would not allow one of the daughters by the first marriage to give him his medicine, saying he knew her voice better; the oldest son of the second marriage had a fuss with one of the daughters of the first marriage and forbade her to come to the house any more, and made her pay two months rent in advance, and said he was the "boss," but she did visit her father's house many times afterwards and he treated her kindly and her stepmother and stepbrothers and sisters always did the same thing when in his presence; one of the daughters of the first marriage was in the next room while the will was being prepared and executed and was not permitted to go in the room during that time, but the same was true of the wife and the children of the second marriage, except that when the lawyers wanted the tax bill, which he said was in the drawer of a stand in the room, in order to get a correct description of the land, the wife was sent for and when she could not find it, the oldest son of the second marriage was called in and found it, and the mother and son then left the room; that he had always said the property came from his first wife and he would not make a will which did not treat all his children alike and that about two weeks after the will was made one of the daughters of the first marriage spoke to him about it, saying she understood he had left the children of the first marriage nothing, and he cried and denied it and told her not to believe what she heard.

Taken in its strongest aspect this does not establish force, coercion, over-persuasion nor that his mind was in "a state of vassalage" by or to any other person whomsoever, relative, wife or child of either marriage; and the case is not strengthened if to this is added the fact that he was "childish," "funny," "worse than a child," that his family "could

not get along with him any more," or that his "wife could not do much with him any more."

There is no fact or circumstance, act or word, done or said by him or any one else in his presence, which supports the charge of undue influence, but the whole evidence is very satisfying and convincing that he knew what he was doing, did what he desired and had a right to do. He equivocated when his daughter told him she heard he had left the children of the first marriage *nothing*, by denying it, but he did not tell an untruth for he did leave them $25 each. He did not tell her the truth when he said he would treat them all alike as the property came from his first wife, but this does not tend to prove that he was under the undue influence of his second wife and her children, but evidences a weakness in not being willing to disclose the truth to his daughter by the first marriage as to how she was to fare under his will.

A critical review of all the evidence fails to show any testimony from which a reasonable or fair inference of undue influence could be drawn or any fact upon which a jury could hinge a verdict against the will. The will and the evidence show an inequality in the disposition of the property, and no especial reason therefor, unless it was that he wanted to provide for his second wife and her children who had remained with him and worked for him all their lives, while the contestants had established homes and raised families of their own. That the contestants needed help any more than the proponents does not appear, but whether they did or not, the property was his and the law gives him the right to dispose of it, if he was competent and acted of his own mind when he made his will.

Upon the whole case we have reached the same conclusion arrived at by the trial court that there is no substantial evidence of incompetency or undue influence in the case, and we therefore affirm the judgment.    All concur.