### JOHN CRUM et al. v. LOUISA V. CRUM et al., Appellants.

#### Division One, December 23, 1910.

1. **WILL: Testamentary Capacity: Test.** If a person has not mind and memory enough to understand the ordinary affairs of life; the value, extent and nature of his property; the number and names of the persons who are the natural objects of his bounty; their deserts, with reference to their conduct and treatment of him; their capacity and necessity; and has not active memory enough to retain all these facts in his mind long enough to have his will prepared, he has not power to dispose of his property by will. A mind so afflicted with weakness and limitations is not a testamentary mind. And where there is substantial testimony tending to establish such a mental condition, the court cannot direct a verdict for proponents, although there is much evidence to the contrary.

2. ———: ———: **This Case: Demurrer.** Testator was 78 years old, had been in good health, and prior to his last sickness was not afflicted with senile dementia. He was self-willed, shrewd, money-making, a little angular in trait. His marriage six

months prior to his death to a widow 58 years old, was not pleasing to his children, and their displeasure somewhat piqued him, but there was no rupture. By his will he gave his entire estate to his wife for life, and provided that at her death it should all be sold, and of the proceeds small amounts should be given to his stepchildren, and the balance equally to his own children. He had had asthma for years, about a month before his death la grippe, attended with its usual fever and affecting his head, laid hold on him, and then pneumonia ran its usual course, and about that time he made his will. The evidence for proponents concedes the fever affected his head at times, and at spells made him wander, markedly so when the fever was high at night, but it tends to show his mind was entirely clear at intervals, especially of mornings, and that on the morning he executed the will he was at himself, dictated its terms, named his children and stepchildren, had a clear and intelligent idea of what he wanted put into it and did it, and when it was read over to him carefully item by item he was asked if he wanted to add to, change or take away anything, and announced himself satisfied; he named the witnesses and asked them to sign it. The testimony for contestants was that la grippe laid a heavy hand upon his brain and seriously affected his mind, which condition grew worse to the end, which came eighteen days after the will was made; that he was unable rationally to transact or comprehend business; that he was "crazy;" mental reckoning was lost, he labored under the delusion he was not at home and wanted to go home, called for his first wife; took the white-wash on the wall for snow, a pair of stockings for two little negroes, and the glow of the firelight for his house burning; frequently did not recognize his own children and other blood kin, mistook some of them for strangers, and was from time to time in a comatose condition. *Held*, that there was sufficient evidence to submit the question of his testamentary capacity to the jury, and its weight was for them, and not for the court; and their verdict setting aside the will will not be disturbed.

3. ———: **Undue Influence.** Where both sides asked and received instructions submitting the issue of undue influence to the jury, the court will not say that the issue should not have been submitted to them, though it may be well argued that there was no evidence of undue influence.

Appeal from Maries Circuit Court.—*Hon. Wm. H. Martin*, Judge.

AFFIRMED.

*Watson & Holmes* and *L. B. Hutchison* for appellants.

(1)   The court erred in refusing defendant's instruction in the nature of a demurrer offered at the close of plaintiff's case.  There is no evidence in this case that would warrant a court or jury to declare that the will in contest was not the true will of R. S. Crum. The test of a testator's competency to make a will is that the testator understood the business about which he was engaged when he had his will prepared and executed, knew the persons who were the natural objects of his bounty, understood his relation to them, and knew what property he had and the disposition he desired to make of it.  Winn v. Grier, 217 Mo. 420; Von De Veld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; Sehr v. Lindeman, 153 Mo. 276; Jackson v. Hardin, 83 Mo. 175; Riley v. Sherwood, 144 Mo. 355; Riggin v. Westminster College, 160 Mo. 570; Couch v. Gentry, 113 Mo. 248; Wood v. Carpenter, 166 Mo. 465; Kirshman v. Scott, 166 Mo. 214; Crowson v. Crowson, 172 Mo. 691; Maddox v. Maddox, 114 Mo. 35; Hamon v. Hamon, 180 Mo. 685; Sayre v. Trustee, 192 Mo. 95; Archambault v. Blanchard, 198 Mo. 384; McFadin v. Catron, 120 Mo. 253.  (2)   Under all the evidence in the case the court should have peremptorily instructed the jury to return a verdict declaring the will in controversy to be the true will of R. S. Crum.  It requires evidence of some probative force that at the time of the execution of the will the testator was not of sound mind and disposing memory.  Von De Veld v. Judy, 143 Mo. 36.  (3)   There is no evidence in the record to prove the charge of undue influence, and the court erred in submitting that question to the jury.  "The influence exercised upon a testator sufficient to invalidate his will must be of such a nature and character as amounts to over-persuasion, coercion, or force, destroying his free agency or will power, as contradistinguished from the mere influence of affection or attachment, or the

desire of gratifying the wishes of one beloved, respected and trusted by him.'' Winn v. Grier, 217 Mo. 420. And this influence must have operated upon the mind of the testator at the time of the making of the will. McFadin v. Catron, 120 Mo. 252; Sunderland v. Hood, 13 Mo. App. 232; Tingley v. Cowgill, 48 Mo. 291; 1 Underhill on Wills, pp. 184, 185.

*Bland, Crites & Murphy* for respondents.

(1) The instructions given for the respondents are, *mutatis mutandis,* the instructions given and approved by this court in the case of Dausman v. Rankin, 189 Mo. 689. And the instructions given for appellant and respondent fully, fairly and correctly declared the law of the case, as laid down by a long and unbroken line of decisions of this court. Winn v. Grier, 217 Mo. 420; Goodfellow v. Shannon, 197 Mo. 271; Aleword v. Briggs, 143 Mo. 604; Riley v. Sherwood, 144 Mo. 354; McFadden v. Carter, 138 Mo. 197; Berbent v. Berbent, 131 Mo. 397. (2) The principal contention is that the court erred in refusing the appellants' instruction in the nature of a demurrer to the evidence at the close of plaintiffs' case. This being a law case, this court will not interfere with the verdict of the jury if there is any substantial evidence in the record to support it. Winn v. Grier, supra; Roberts v. Bartlett, 190 Mo. 680; Hill v. Boyd, 199 Mo. 448; Mowry v. Norman, 204 Mo. 173; Holton v. Cochran, 208 Mo. 314.

LAMM, P. J.—The issue below was: Will or no will—*devisavit vel non.* Plaintiffs are the children and heirs of R. S. Crum—defendant Louisa V. is his widow, and her codefendant, Leslie B., is her son by a former marriage.

R. S. Crum died testate on March 24, 1906, a citizen of Maries county, seized of real and personal estate, and aged seventy-eight years. After ordering his debts paid, and monuments erected to mark the final

resting places of himself and former wife, Harriet, his will devised to his widow all his real estate to hold during her natural life, she to have charge, and enjoy the rents and profits thereof, subject to debts and taxes. It bequeathed to her all his household and kitchen furniture, chickens, provisions on hand at his death, and a two-horse buggy. At her death the remaining real estate was to be disposed of, and the proceeds, less expenses, divided between named children and stepchildren—the latter, children of his first wife by her former marriage. Naming his stepchildren, they were to have four hundred dollars each, provided they allowed a certain note signed by one Meyers and Gillispie, in testator's possession and payable to his former wife, Harriet, to go into the hands of his executors and merge in the corpus of his estate—if they refused to allow the note to so merge, they were to have nothing under the will. Finally, his property of whatever kind, after his widow's death, was to be sold and the proceeds divided share and share alike among his own children, they being made residuary legatees. His son John and defendant Leslie B., nominated executors, qualified and took upon themselves the burden of administration a day or so after testator's death.

On August 16, 1906, plaintiffs sued to break the will, tendering three issues, namely, testamentary incapacity, undue influence of both defendants and their fraud.

The answer admits the relationship and heirship of plaintiffs; that Louisa V. Crum is widow and Leslie B. Hutchison executor as charged; that the will had been formally probated and at present stands as R. S. Crum's will—averring it is his true will and denying the allegations of fraud, testamentary incapacity and undue influence.

The issue of fraud was not put to the jury and drops out of the case. The other two were submitted and a general verdict came in, signed by ten jurymen,

finding the paper writing submitted as the last will and testament of R. S. Crum, not to be his true will.

From a judgment on that verdict, defendants, on due steps taken in apt time and order, come up by appeal—planting themselves here on a brace of propositions, viz.:

*First.* The court erred in refusing an instruction in the nature of a demurrer at the close of plaintiffs' case, and herein that the court should have instructed the jury to return a verdict sustaining the will.

*Second.* There was no evidence of the charge of undue influence, hence, it was reversible error to submit that issue to the jury.

Both assignments of error seek the facts, which, in small compass, are: Marrying Mrs. Louisa V. Hutchison, a widow, in September, 1905, and dying six months later, R. S. Crum was a self-willed and shrewd man, a little angular in trait, with an uncommonly canny knack of money making—able to neither read nor write and educated only in the world schools of experience and observation. Marrying once and possibly twice before, a large family were born to and survive him. It is singular that the whole extent and value of his own estate and the conditions in life of the natural objects of his bounty—that is, the amount of testator's estate, together with the needs and estates of his children and wife (somewhat proper subjects of inquiry in a legal contest over an alleged unnatural will) are left dark in the record. He came down to the year 1906 attending to his affairs and fit to do so with good sense—this, although he was planning (as he thought) to throw off his burden of business care to round the end of his life with ease and dignity by acquiring a town house and renting or selling his lands; for the record shows his years were nigh four-score and warned him of the imminent approach of that stage of human life, when, as the Preacher (doubtless, no other than the very Solomon

himself) puts it, the evil days come, days giving no pleasure, when one shall be afraid of that which is high, the grasshopper shall be a burden, desire shall fail and man goeth 'to his long home. After his marriage he bought a town home, a four-acre tract in Vienna, in accordance with his plans. Prior to his last sickness he was not afflicted with *senile dementia,* general insanity or any form of monomania. His testamentary incapacity arose from his last sickness, or not at all. He lived on his farm, say, two miles and a half from Vienna, the capital of Maries county. His wife was fifty-eight years old and they had known each other for a long time. Towards the end of February, 1906, he took down sick, growing worse till he died on the 26th of March. For years he had suffered from asthma. His last sickness commenced with a severe attack of that ailment. Presently that insidious disease known as la grippe set in, attended with its usual fever, not only feeding and accentuating the asthma but affecting his head. Presently, before making his will on the 8th of March, pneumonia set in and ran its course. He does not seem to have died from the pneumonia, but from a weakened condition or depression resulting from a general disability, due to said complication of diseases lowering away his vitality and carrying him off. The record shows some faint trace of antenuptial negotiations looking to a property arrangement between him and Mrs. Hutchison, but we can make little of it. In two or three casual conversations antedating his last sickness, he disclosed a testamentary intention to carve out a life estate in all his real estate in favor of his new wife, just as he did. There is testimony showing a different testamentary disposition. There had been a former will but we know nothing of its terms. Testator, as we gather, was living at his home with a married daughter, Mrs. Brown, at the time of his marriage. There is some testimony tending to show that his children did not take

kindly to his marriage and that the old gentleman was a little piqued thereat. Smarting therefrom, he indicated in casual conversation with one or two acquaintances that he might turn his property into cash, put the money "in a sock" for ready use to meet any needs of his new matrimonial alliance, and, if pushed too far, might take the money and leave the country. However, the testimony does not create the impression there was any surface or real impairment of his parental relations with his children. They seem to have been attentive and affectionate to him, gathering about him in his last sickness with offices of love and good will. There is no indication he did not return their affection. Speaking of the genesis of the will, there is some evidence tending to show that the idea of a new will originated, during the last sickness, with his wife. *Contra,* there is persuasive testimony tending to show it was his own plan and had been entertained prior to the time he was stricken down. There is some testimony tending to show he desired a neighbor, Mr. Hawkins, to do the writing and that his wife desired a son, her codefendant, an attorney in Vienna to do it, and attained her desire. *Contra,* there is testimony tending to show her said son, when asked by testator to draw his will, at a certain time before the last sickness, suggested another attorney, hesitated to be his legal adviser in the premises and only consented to serve in that capacity because of testator's persistency in finally exacting a promise from him that he would come at once on an urgent call. There is testimony having a tendency to show on one side and countervailing testimony on the other that Mr. Hutchison at some time during testator's last sickness, but before the visit when the will was written, drove out to testator's house to write it but did not find testator in a satisfactory condition. The evidence differs as to when the will was written. All sides agree that Mr. Hutchison was sent for on the 7th and arrived about noon of that

day. There is testimony that a consultation was then held between testator and Hutchison, at which Mrs. Crum was present, while others, relatives, present in the house were excluded. There is countervailing testimony on the point. Mr. Hutchison's visit was prolonged from about noon of the 7th to the middle of the forenoon of the 8th. Some of the testimony indicates the will was written partly on the 7th and partly on the 8th—the greater weight, that it was commenced about five o'clock a. m. on the 8th and finished about half past eight or nine o'clock of that day. Two of testator's tenants, John Crum, a brother, and Lee, son of the latter and nephew of the testator, were present part of the time (Lee being called in to witness the will); also John Crum's wife and Mr. Parker, a sweetheart of a daughter of defendant Louisa V.; the latter herself, Mr. Hutchison, John Crum, Jr., the family physician, Von Gremp, also were present, some all, some part of the time, and maybe some others passed in or out casually during that time. There is testimony another son undertook to enter but was told, by someone other than defendant Louisa, he was not wanted in there, but this is denied. One witness testified that prior to writing the will, when testator nearly smothered with a severe spasm of asthma, on getting his breath he announced that he had nearly "went" that time, his wife replying, "and no writings yet." The remark is denied, but it may be said generally that there are traces of some solicitude and effort directed to procuring a testamentary writing making a property disposition in favor of defendant, Louisa V. Crum.

The foregoing resume of the effect of so much of the testimony brings us to the *crux* of the case, viz., testamentary capacity at the time the will was executed. The testimony is in sharp conflict, as it always is in a quarrel over a dead man's estate. If we had judicial call to pass upon its weight in an action at law, we would say it preponderates in favor of proponents.

John Crum, Jr., the son, was present, was named a coexecutor, is a plaintiff and did not testify. There is testimony that when the will was written and signed, the father spoke to his son and charged him with the duty of seeing it fully carried out. As he stood mute at the trial, that admonition may be assumed as true. On proponents' part the evidence concedes the fever affected testator's head at times, and at spells made him wander and "flighty" in mind, markedly so when the fever was high at night. Their testimony tends to show that his mind was entirely clear at intervals, especially of mornings; that on the morning he executed his will he was at himself, dictated its terms, named his children and stepchildren, had a clear and intelligent idea of what he wanted to put in his will and did it; that he referred the scrivener to his tax receipts for a description of his real estate (which was inserted in the will); that when the will was read over to him with care, item by item, he was asked if he wanted to add to, change or take anything away from it and he announced himself as satisfied, named the witnesses thereto and executors, and asked the witnesses to sign—in other words, that the will was the rational act of a man of sound mind and memory. But there is testimony to the contrary. Some of it covers the whole period of his sickness after the first few days, and indicates that la grippe had laid a heavy hand upon his brain and seriously affected his mind, which condition grew worse to the end; that he was unable to rationally transact or comprehend business. The evidence ranges from proof that he was in a condition denominated "crazy" to proof of those irrational wanderings, showing mental reckoning lost, we are all familiar with as attending on fever. He labored under the delusion he was not at home and wanted to go home, called for Harriet, his first wife, took the whitewash on the wall for snow, the glow of the firelight for his house burning, a pair of stockings on the

wall for two little negroes, frequently did not recognize his own children and other blood kin, mistook some of them for strangers, thought one of his sons was a man named Smallwood, gave other relatives other names like "Fisher" and "Finnesey," and was in a comatose condition from time to time. We think without going further into it, there was evidence from which a jury might infer, without violence to common sense, that his mind was disordered on the 7th, on the night of the 7th and 8th and in the forenoon of the 8th, when the will was in preparation, as well as before and after that time. There is also evidence that afterwards testator had a confused idea he had done something wrong or had been persuaded to do something by others that he should not have done. One witness testified that Mrs. Crum admitted he would not have made the will if she had not got him to do it, though this is contradicted.

The formal execution of the will was proved and the first question is: Should the case have been allowed to go to the jury at all? Put otherwise, should the general demurrer to the evidence have been sustained, after proponents had made a prima facie case and the evidence of contestants was in?

We think the demurrer well ruled. It was not directed to the issue of undue influence, or to the issue of testamentary incapacity, but to both; therefore, if there was evidence to carry the case to the jury on either, it was bad. If we could meddle with the weight of the evidence, we would have a different case to deal with. If the learned trial judge had sustained the motion for a new trial because he was not satisfied the verdict was supported by the weight of the evidence, we do not think we would have interfered with his discretion. But the case is here on the narrow point that there was no substantial evidence whatever to support the verdict and we decline to rule that way. There certainly was evidence, if the jury believed it, pointing to an inca-

pacity of testator to deal with his business affairs at the time he executed his will.

Our statutes make a just disposition of property, absent the will. We are not called upon, therefore, to sustain a will because of any inherent defect or injustice in the statutory scheme for the devolution of estates. The right to make a will when of sound mind and disposing memory is a precious one jealously safeguarded by the courts; and this court has not been remiss in holding a steady and conservative voice in that regard. We have declined to accept the doctrine that mere isolated incidents of oddities and eccentricities or acts sounding to folly, *combed* together without relation to each other and arrayed theatrically, indicated a mind of that degree of unsoundness importing testamentary incapacity, but we have always recognized that testamentary incapacity may be shown to exist when the mind is so disordered by the ravages of disease and so dull and torpid as not to measure up to a common-sense testamentary mark.

In Boyse v. Rossborough, decided in the House of Lords in 1857 (6 H. of L. Cas.), there fell from Lord Chancellor CRANWORTH the following pronouncement, happily stating the delicacy of the inquiry when the question is: Had testator a sound mind? "On the first head" (speaking to the question just propounded) "the difficulty to be grappled with arises from the circumstance that the question is almost always one of degree. There is no difficulty in the case of a raving madman or of a drivelling idiot, in saying that he is not a person capable of disposing of property. But between such an extreme case and that of a man of perfectly sound and vigorous understanding, there is every shade of intellect, every degree of mental capacity. There is no possibility of mistaking midnight for noon; but at what precise moment twilight becomes darkness is hard to determine."

Thirty years ago there was transplanted into the doctrines of this court from the text of Judge Redfield's work on Wills (Brinkham v. Rueggesick, 71 Mo. l. c. 555) the following propositions: "We have no instrument by which we can assume to measure the extent of mental capacity. Each case will have to be decided upon its own peculiar facts and circumstances . . . ."

A general definition satisfying the judicial mind in this jurisdiction, must be deduced from many cases and we think may be held to be that if a person has not mind and memory enough to understand the ordinary affairs of life; the value, extent and nature of his property; the number and names of the persons who are the natural objects of his bounty; their deserts with reference to their conduct and treatment of him; their capacity and necessity; and has not active memory enough to retain all these facts in his mind long enough to have his will prepared—he has no power to dispose of his property by will—a mind so afflicted with weakness and limitations is not a testamentary mind. Such is the rule in a sister State, Indiana (Bower v. Bower, 146 Ind. l. c. 398, *et seq.,* and cases cited), and such in effect is the doctrine of this court as gathered from a line of cases such as: Riggin v. Westminster College, 160 Mo. 579; Holton v. Cochran, 208 Mo. 314; Goodfellow v. Shannon, 197 Mo. 271; Meier v. Buchter, 197 Mo. 68; Knapp v. Trust Company, 199 Mo. 665; Harvey v. Sullens, 56 Mo. 372. In some of these cases the definition of testamentary incapacity is shortened, one judge using one form of words and another another.; but when analyzed the language imports what we announce. To make a will a person must know what he is about and what he wants to do with his property, and to know those things he must have a mind of the character indicated in the definition. In this case it was for the jury, not the court, to say whether Mr. Crum's mind filled the bill. There was no error in

overruling the demurrer to the evidence, nor was the court remiss in not directing a verdict solemnly probating the will. This latter for reasons aforesaid and because the court could not be put in the wrong when, as here, no mandatory instruction was asked.

There is one other proposition relating to the issue of undue influence. It is argued by appellants that such issue was put to the jury when there was no supporting proof. There is ground for that argument to travel on but we may not reverse a judgment merely because a proposition, *arguendo,* is tenable. The question on appeal is: Was the exception passed on below? Next, was the ruling reversible error? In this case the record shows that contestants as well as proponents asked and got instructions submitting the issue of undue influence to the jury. In such case, the rule is that consent healed the error, if any. The trial judge may not be convicted of error in doing what both parties asked him to do in declaring the law. Participating is tantamount to precluding future objections. If proponents had not asked an instruction submitting the question of undue influence to the jury, in the first instance, but (heading the other way) had asked one to the effect that the issue of undue influence was taken from the jury because of a failure of proof, and that instruction had been refused, then we are not called upon to say whether if in that pickle they had asked an instruction on undue influence, they would have cured or waived the error, but we do say there would have been a different case here for decision. As the case stands on this record, in the particulars above, the question is not whether there was evidence tending to show undue influence. It is whether there is evidence to sustain either issue. If there was, we should not disturb the verdict. There is, and we will not.

We perceive no reversible error. Let the judgment be affirmed. All concur.