**Clarence COCKRUM et al.,**
**Plaintiffs-Appellants,**

v.

**Nuel F. COCKRUM,**
**Defendant-Respondent,**

**and**

**Matt Cockrum, Defendant.**

**No. 10024.**

Missouri Court of Appeals,
Springfield District.

April 15, 1977.

---

Newton C. Brill, Moore & Brill, West Plains, for plaintiffs-appellants.

A. F. Turner, Mountain Grove, Quentin Haden, Ava, Russell G. Clark, Woolsey, Fisher, Clark, Whiteaker & Stenger, Springfield, for defendant-respondent.

Before STONE, P. J., and TITUS and FLANIGAN, JJ.

TITUS, Judge.

Clay Cockrum (Clay), owner of a 155-acre Ozark County farm, died February 24, 1970. An instrument dated December 29, 1969, was adjudged by the Probate Court of Ozark County to be Clay's last will and testament. A nephew of decedent, Nuel Cockrum (Nuel), was named the executor and sole beneficiary of the will. Two of Clay's brothers and a daughter of a deceased brother brought this action to contest the will claiming, alternatively, that Clay was not competent to execute a will, that Clay had revoked the will, or that Clay executed the will under the undue influence of Nuel. After changes of venue and judges had been procured and jury waived, the cause was tried to a special judge in the Circuit Court of Howell County. The testimony of 21 witnesses, in person and via deposition, consumed the two days it took to try the matter. Judgment was rendered declaring the instrument in question to be decedent's last will and testament. Plaintiffs appealed.[1]

The standard for appellate review in court-tried cases under Rule 73.01–3(a), V.A.M.R., obliges us to affirm the judgment nisi "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously ap-

---

1. The matter on appeal comes to the writer of this opinion by way of reassignment.

plies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32[1, 2] (Mo. banc 1976). In addition, Rule 73.01–3(b) admonishes that "Due regard shall be given [by appellate courts] to the opportunity of the trial court to have judged the credibility of witnesses." In this same vein is the rule that the trial court, when sitting as the trier of the facts, has leave to believe all, part or none of the testimony of any witness. *Long v. Lincoln*, 528 S.W.2d 512, 513 (Mo.App.1975).

■ Several days prior to the signing of the will, Nuel went to a lawyer explaining that Clay wanted a deed prepared conveying his property to Nuel. The lawyer counseled against this, lest it would jeopardize Clay's "welfare" payments, and suggested a will. Nuel returned December 29, 1969; the lawyer prepared the will and gave it to Nuel. At that time Clay was living in Nuel's home. On the 29th two neighbors were asked to come to Nuel's residence to serve as attesting witnesses. These witnesses testified they were at the house "an hour or so" visiting with Clay who looked and acted "about like he always did." During this period the will was read aloud to Clay once by Nuel's wife and twice by one of the attesting witnesses. Each time the readers inquired of Clay, "is this what you want," and Clay would answer, "yes, this is what I want." Thereafter, Clay and the two witnesses signed the will. These attesting witnesses, and others who testified, opined that at and near the time the will was signed, Clay was of sound mind, understood the ordinary affairs of life, knew the nature and extent of his property and the *persons who were* the natural objects of his bounty, and appreciated his natural obligations to those persons.[2] There was also testimony that Clay, both before, at the time of and after signing the will, ex-

pressed the desire that Nuel was to have his "place" because "I don't owe my brothers nothing."

■ As would be expected in a case of this kind, the plaintiffs produced witnesses who testified to reported conduct on Clay's part which, if taken collectively and if believed to have existed at the time the will was executed, would tend to prove that Clay did not possess the necessary requirements for testamentary capacity. They introduced the deposition of a physician who attended Clay while he was hospitalized in November 1969 and again in February 1970 shortly before his demise. The doctor diagnosed Clay's condition as "metastic carcinoma from the esophagus to the lung and brain." When Clay entered the hospital November 7, 1969, he lacked total control of his body movements, could not stand or walk, and was unable to speak coherently. However, Clay improved with medication and treatment, and when discharged on November 15, 1969 (six weeks prior to execution of the will), the doctor said Clay "was up and about, speaking, in control of his faculties." In response to a hypothetical question, the physician answered that he had "no cogent opinion" as to whether Clay "would be easily influenced on December 29, 1969." In November 1969 the doctor did not consider Clay's condition "terminal." Plaintiffs suggest the mere diagnosis of brain cancer constituted conclusive proof of testamentary incapacity and rely on *Detrich v. Mercantile Trust Company*, 292 S.W.2d 300 (Mo.1956). The facts in *Detrich* differ from those presented here. In the reported case the jury found testatrix to have been of unsound mind when she signed her will. This finding was permissible from the undisputed medical evidence that before execution of the will testatrix was suffering from irreversible brain damage which caused her to have an unsound mind. The court concluded that from "the nature of her illness, that it was permanent and progressive, 'not reversible,' there was a pre-

<hr/>

2. These, generally, are the requirements for testamentary capacity. *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo.1967); *Sturm v. Routh*, 373 S.W.2d 922, 928[3] (Mo.1964); *Crum v.*

*Crum*, 231 Mo. 626, 638, 132 S.W. 1070, 1073[4] (1910); Page on Wills (Bowe-Parker Rev.) § 12.17, at pp. 598–599; MAI 15.01.

sumption that her incapacity continued down to and including the making of the will." (Id. 303[4]). In the instant case no doctor said that Clay's condition resulted in his having an unsound mind prior to execution of the will. Therefore, the presumption which arose in *Detrich* would have no foundation in this cause.

. Without resorting to a detailed recasting of the prolix testimony given by the witnesses regarding Clay's competency to execute the will, it is enough to say that whether he had testamentary capacity vel non when the will was made was subject to conflicting evidence which presents a situation calling for due deference being given to the superior opportunity of a trial court to have judged the credibility of the witnesses. We could not rule in comfort that the court's finding that Clay was competent to execute the will when he did was not supported by substantial evidence or was against the weight of the evidence.

■ Next we consider plaintiffs' seemingly paradoxical claim that Clay had revoked the will. Revocation must be done animo revocandi (with intention to revoke) and while the testator is possessed of the same testamentary capacities necessary to make a valid will. *Schaaf v. Peters*, 111 Mo.App. 447, 459, 90 S.W. 1037, 1040[4] (1901); Page on Wills (Bowe-Parker Rev.) § 21.27, p. 387; 95 C.J.S. Wills, § 264, p. 31; 79 Am.Jur.2d, Wills, § 500, at p. 267. Therefore, if Clay had not been competent to execute the will as declared by plaintiffs, he would not have been competent to revoke it in any of the ways specified in § 474.400, V.A.M.S.[3] But since the trial court found Clay was competent to make the will and had not revoked it, we will explore the matter of revocation in light of the following additional facts.

Subsequent to the execution of the will and while Clay was yet alive, Nuel, with the original will in his possession, made a third visit to the lawyer who was scrivener of the testament concerning "representing him in a matter that had been brought to have a guardian appointed for Clay." The lawyer declined, as he was then representing one of Clay's brothers (later a contestant of the will) in the guardianship affair. On this occasion the lawyer made a photocopy of the executed and witnessed original will for his files and returned the original thereof to Nuel. After Clay's death, Nuel made a fourth call upon the lawyer and obtained from him a photocopy of the first photocopy of the original will. It was the photocopy of the first photocopy of the will that was received and stood as evidence of Clay's last will and testament.

■ In a will contest case, the burden of proving revocation is on the party alleging the defense. *Yates v. Jeans*, 345 S.W.2d 657, 660[1] (Mo.App.1961); 95 C.J.S. Wills § 385, p. 279. The testimony evinced four possible bizarre explanations for the absence of the original will. Nuel's mother testified that she regularly kept all of Clay's papers, including the original will given her by Nuel, locked in a trunk at her home. One day after Clay's death, and while another son and his wife were present, she burned the original will upon the instructions of her husband, who died before trial. The son and daughter-in-law, called as plaintiffs' witnesses, acknowledged they had observed a burning but disavowed having read the purported will before it was burned and opined the burned paper was not of legal size. The lawyer-scrivener of the will said it and the photocopies made thereof were on legal size paper and that Nuel's avowed reason for wanting a photocopy of his photocopy was that the original will had been stolen from his dresser drawer on the day he took Clay to a Springfield hospital in February 1970. A contestant of the will testified that two weeks before trial of the instant matter Nuel had admitted telling either the lawyer-scrivener of the will or the person who was probate judge in 1969–70 (they both

3. This conclusion ignores the possibility that a testator may have been competent at the time of making the will and later have been incompetent when he undertook to revoke the will or vice versa. This possibility has not been suggested in the instant case but should not be overlooked if facts make it applicable.

had the same surnames) that Clay "burned the will up." The former probate judge just mentioned, who acknowledged having been approached on the subject by all concerned, recalled that during a discussion with Nuel the latter told him that Clay " 'called for the will and I got it for him . . . and he tore the whole thing up.' "

Here again we have sharp conflicts in the testimony for resolution by the fact trier. The statements attributed to Nuel as to what happened to the original will are certainly not compatible. If the will was stolen from Nuel's dresser while Clay was in the hospital in Springfield, then Clay could not have torn or burned it unless the thief had thereafter given it to Clay. Likewise, if Clay had "burned the will up" it would appear unlikely that anything remained which could be torn, or if he had first "tore the whole thing up" it would seem unnecessary that he cremate the pieces. Also, if the testimony of plaintiffs' witnesses anent Clay's physical condition at and subsequent to the signing of the will was believable, it would have been next to impossible for Clay to have either torn or burned the document. One thing that could have prompted the trial court into concluding that Clay had not revoked the will was the utter dearth of any evidence that Clay had ever mentioned a revocation albeit there were numerous occasions on which he could have done so if it was a fact.

 Plaintiffs seek reliance on the presumption of revocation when a will, last known to be in possession of the testator, cannot be found upon death. *Vesser v. Neff*, 214 S.W. 185, 189 (Mo.1919); *Hamilton v. Crowe*, 175 Mo. 634, 647, 75 S.W. 389, 392 (1903); *Yates v. Jeans*, supra, 345 S.W.2d at 661[2]; 95 C.J.S. Wills, § 385, p. 283. This presumption must be established by proper evidence by those who seek its benefit. It is not all conclusive and may be rebutted. *Board of Trustees of Methodist Church v. Welpton*, 284 S.W.2d 580, 583[2] (Mo.1955); *McMurtrey v. Kopke*, 250 S.W. 399, 401[3] (Mo.1923).

 We doubt that plaintiffs adduced sufficient evidence to raise the presumption

of revocation. Except for the statements of tearing and burning attributed to Nuel, no evidence of record indicates Clay had possession of the will after it was executed. The evidence tended to show that either Nuel or his mother had possession of the will subsequent to its signing. However, even if we assume the presumption arose, the evidence of lack of access by Clay to the will [*Mann v. Balfour*, 187 Mo. 290, 307–308, 86 S.W. 103, 107 (1905); 95 C.J.S. Wills § 385, at pp. 286–287; 24 Wash.U.L.Q. 105, at 112] and statements allegedly made by Clay near time of death tending to show its continued existence [*McClellan v. Owens*, 335 Mo. 884, 894, 74 S.W.2d 570, 575[8] (1934); *Peters v. Dodd*, 328 S.W.2d 603, 608[2, 3] (Mo.1959); Page on Wills (Bowe-Parker Rev.) § 29.146] would substantially rebut the presumption.

It is our view that the trial court's ruling on the absence of revocation was based upon substantial evidence.

 Finally, we consider the finding by the trial court that the will was not executed under Nuel's undue influence. The burden of proving undue influence rests, of course, upon the contestants [*Martin v. O'Connor*, 406 S.W.2d 41, 43[5] (Mo. 1966)] who can meet the burden only upon the introduction of substantial evidence. *Switzer v. Switzer*, 373 S.W.2d 930, 932[2] (Mo.1964). "By 'undue influence' is meant such influence as amounts to force, coercion, or overpersuasion, which destroys the free agency and will power of the testator." *Sehr v. Lindemann*, 153 Mo. 276, 289, 54 S.W. 537, 540 (1899). Undue influence sufficient to overturn a will must be of such strength that the will is not that of the testator but that of the party exercising the undue influence. *Sweeney v. Eaton*, 486 S.W.2d 453, 455 (Mo.1972). It is not a natural affection felt by the testator [*Metter v. Janssen*, 498 S.W.2d 581, 583[3] (Mo.App. 1973), cert. den., 414 U.S. 1115, 94 S.Ct. 848, 38 L.Ed.2d 742 (1973)] and it is not the existence of undue influence but rather its exercise at the time of execution of the will which invalidates the will [*Switzer v. Switz-*

*er,* supra, 373 S.W.2d at 938[8]], although the exertion of the influence at the exact time of execution need not be proved. *Salisbury v. Gardner,* 515 S.W.2d 881, 886[6] (Mo.App.1974).

 A presumption of undue influence will arise if the contestants of a will can sufficiently establish [4] three elements, namely, (1) procurement of the will by a beneficiary, (2) a confidential relationship between the testator and the beneficiary, and (3) benefaction by the one procuring the will. *Pulitzer v. Chapman,* 337 Mo. 298, 316, 85 S.W.2d 400, 409[3] (banc 1935); *Simmons v. Inman,* 471 S.W.2d 203, 206[1] (Mo. 1971); *Salisbury v. Gardner,* supra, 515 S.W.2d at 884[2]. Although the presumption may be rebutted, it does not disappear from the case and raises an issue for the trier of the facts. *Loehr v. Starke,* 332 Mo. 131, 142, 56 S.W.2d 772, 776[3] (banc 1932); *Pasternak v. Mashak,* 392 S.W.2d 631, 636[4] (Mo.App.1965). As Nuel was the sole beneficiary under the will and had retained the scrivener of the will, elements (1) and (3) are not at issue, leaving only element (2) to be decided.

 Required in a finding of a confidential relationship are the aspects of trust and reliance in regard to transactions of property and business. *Sweeney v. Eaton,* supra, 486 S.W.2d at 455[3]; *Wilhoit v. Fite,* 341 S.W.2d 806, 813[6] (Mo.1960); *Salisbury v. Gardner,* supra, 515 S.W.2d at 884–885[3]; *Godsy v. Godsy,* 504 S.W.2d 209, 212[3] (Mo. App.1973).

 The only evidence in the case of Clay's trust in reliance on Nuel in regard to transactions of property and business relate to his dealings with the lawyer whom Nuel first consulted about preparing a deed and next saw for the purpose of having a will drawn. If Nuel had ever handled any other business affairs or transactions of property for Clay, the record does not show it. While Nuel apparently had possession of Clay's deeds when he first visited the lawyer and had possession of the will at times after it was executed, the evidence indicates these documents were usually kept by Nuel's mother (Clay's sister-in-law) in a locked trunk at her home. The testimony apparently given credence by the trial court was to the effect that the disposition of the property as affected by the will was what Clay truly wanted and that Nuel exerted no more influence than did the other heirs. Moreover, there was an abundance of testimony that prior to, at the time of and after the execution of the will Clay expressed a desire that Nuel have the land and that he didn't "owe my brothers nothing." The trial court found there was no confidential relationship between Clay and Nuel. This absent element mandates a finding of no presumption of undue influence and plaintiffs' burden of proving undue influence without aid of the presumption is indeed a difficult one. As has been done with all other issues presented on appeal, we hold that the trial court's ruling that the will was not executed under Nuel's undue influence was based upon substantial evidence.

The judgment nisi is affirmed.

All concur.

---

**4.** The presumption of undue influence may be proved by circumstantial as well as by direct evidence. *Sweeney v. Eaton,* 486 S.W.2d 453, 455[1] (Mo.1972); *Wilhoit v. Fite,* 341 S.W.2d 806, 813[2] (Mo.1960).