Richardson v. Smart.

they were taken up, the party aggrieved would have no remedy at all.

All the judges concurring, the judgment is affirmed.

---

WILLIAM E. RICHARDSON, Administrator of THOMAS GOTHAM, Respondent, v. ROBYNA SMART *et al*, Defendants; ROBYNA SMART, Appellant.

St. Louis Court of Appeals, January 21, 1896.

1. **Gifts**: MENTAL COMPETENCY OF DONOR. A donor is mentally capable of making a gift, when he is conscious of his acts and understands their nature and effect.

2. ———: ———: TEMPORARY INSANITY: BURDEN OF PROOF. Proof of insanity not habitual or permanent, but wholly due to the violence of disease, does not involve a presumption of its continuance; accordingly, a party who alleges it in avoidance of an act must bring his proof of continued insanity to that point of time which bears directly upon the subject in controversy, and not content himself merely with proof of insanity at an earlier period.

3. ———: ———: SUFFICIENCY OF EVIDENCE. Evidence of improvidence alone will not supply the place of proof of insanity; nor can a gift be annulled merely because it may seem to the trier of the facts to have been made without adequate motive.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

REVERSED.

*Nathan Frank, Charles W. Bates* and *David Goldsmith* for appellants.

*Lubke & Muench* for respondent.

BOND, J.—This suit is by the administrator of Thomas Gotham to set aside a gift of three shares of

stock in the Mechanics' Planing Mill, of the par value of $500 each, made by his intestate to the defendant, on the fourth day of August, 1894. The equity alleged in the petition is that the gift was without any consideration, and made when the donor was "in a sick and dying condition and unconscious of his own acts, and incapable of performing any contract or business transaction." The answer was a general denial. There was a decree for plaintiff, and defendant appealed.

As the gift in question was formally complete, the burden rests upon plaintiff to establish its invalidity. The facts attending the making of the gift are these: The donor, Thomas Gotham, living in Clinton, Iowa, and aged about fifty-seven years, was taken ill with chills and fever on July 25, 1894; at this time he was residing in the family of Mr. Harrell, having separated from his second wife, who had also sued him for maintenance. Gotham remained at Harrell's until the twelfth of August, when he was removed to the hospital, where he died on August 29, 1894. From the twenty-ninth of July, 1894, until his removal to the hospital, his physician was Dr. Brown. While he was at the hospital, he was attended by a physician of that institution. His disease at an early stage developed typhoid fever. A number of his relatives lived in the city, including a Mr. Richardson, his maternal uncle. His mother, Mrs. Hambleton, was also visiting there. The shares of stock in controversy were in the custody of Mr. Richardson, who had held them about a year for safe keeping. During his sickness Gotham was visited by his mother and other relatives. On one of these occasions he requested his mother to have Mr. Richardson bring him the certificates with transfers thereon in blank. Mr. Richardson complied with this request, and in company with Mrs. Hambleton took the shares to Gotham. They found him lying on the

sofa, Mrs. Harrell, and probably her daughter also, being in the room. Mrs. Harrell was then requested to leave; by whom does not clearly appear, for she states that this request was made by Mrs. Hambleton, while the latter and Mr. Richardson say that Gotham himself made the request. Then, at Gotham's direction, the name of Mrs. Smart was inserted in the blanks left for that of the transferee, and the papers were signed by Gotham, and by him handed to Mr. Richardson. This occurred on Saturday, August 4. On the following Monday, Gotham inquired whether the papers had been forwarded to Mrs. Smart, and, learning that they had not, caused them to be mailed to her.

It appears from plaintiff's evidence that, during the first two weeks of Gotham's sickness, he was at times rendered insane by the violence of his disease; that, while so affected, he failed to recognize his physician and other visitors, and talked incoherently; that at other times during the same period he was apparently rational. In specifying instances, plaintiff's witnesses testified that the deceased did not recognize his attorney on August 7, 1894, though he did remember him on August 11, and conversed with him in reference to being removed to the hospital, where he was carried in a buggy on the next day; that at times he mistook his physician for the sheriff; that he also failed to recognize Mr. Peterson, and a neighbor, Mr. Howell; that during this portion of his sickness he went to a saloon and got beer and mixed it with milk, saying he had been ordered to do so by the doctor; also that he was seen sitting in the saloon, and another time sitting on a step on the street with two empty bottles, and another time lying on the street; also that Mrs. Howell saw him go out once when he said he was going to a dance, though she says none was going on in the

vicinity at the time; and that another time she saw him get his pillow and lie down on the porch.

On the other hand, an equal number of witnesses for defendant stated that at the times they saw Gotham, including the third and fourth days of August, 1894, he was rational and fully capable of transacting business. One of these, a Mr. Jeffries, states that about the last of July he drove with Gotham to the bank, where Gotham drew money on a certificate of deposit; that afterward, on the third of August, Gotham requested Mrs. Jeffries to tell her husband that he wanted to procure more money on this certificate, and on receiving the message, Mr. Jeffries called on Gotham the same day. Gotham took the certificate from his inside vest pocket, indorsed his name thereon, handed it to Mr. Jeffries, and requested the latter to take it to the bank and obtain $5 on it. Mr. Jeffries did this, and the bank gave him a fresh certificate which he brought back and delivered to Gotham; the latter placed it in his inside pocket, and still had it at his death three weeks later at the hospital. Another of defendant's witnesses, a Mr. Richardson, testified that, upon receiving a verbal message to that effect from Gotham, he filled out blank transfers of the three shares of stock in his custody and took them, in company with his sister, to Gotham; that Gotham "asked me if I brought up that stock. I told him I had. Well, he says, I want to assign that stock over to Robyna. He didn't say Robyna, but Byna," by which latter name he always called defendant; that the papers thus prepared were read over to Gotham and handed to him, whereupon he took a pen and signed them; that in so doing he raised himself from a lounge where he was lying, "took his specs out of a small pocket in the shirt he wore, they were loose in the pocket, put them on; and the

papers he had on a flat book so that he could write on it;" that this occurred about 3 P. M., Saturday, August 4; that at Gotham's request he took the papers home with him and mailed them the following Monday to the defendant. Sometime after this occurrence, and before the death of Gotham, this witness testified that he informed Gotham's daughter that the shares had been transferred to defendant.

It appears from the evidence of the administrator in Iowa that the estate of the deceased will realize, exclusive of the shares in question, about $944, and that the claims filed against it there amount to about $192. It was further shown that the stock in dispute was worth about $1,500.

From the evidence for plaintiff we find the facts to be that Thomas Gotham was not affected with habitual or permanent insanity, but that he was, during the first two or three weeks of his illness, at times sane and other times insane, and that these alterations in his mental state were caused by variations in the violence of his disease. From all the evidence we find the fact to be, that on the fourth of August, 1894, Thomas Gotham was conscious of his acts and understood their nature and effect, and was, therefore, mentally capable of making the gift then executed by him. *Nichols & Shepard Company v. Hardman*, 62 Mo. App. 153; *Cutler v. Zollinger*, 117 Mo. 101. These findings reconcile the direct evidence on both sides as to the facts manifesting insanity, since all the evidence for plaintiff shows that the insanity of the deceased was intermittent, and does not show that the fourth of August, 1894, was not a sane interval. Hence, there is no contradiction of the evidence adduced by defendant, that the deceased was rational on that day. As to the opinions expressed by plaintiff's witnesses as to the insanity of the donor on the fourth of August, it may be said they did not pur-

port to be based upon facts shown to have happened on that day, and hence are entitled to little, if any, weight, and are certainly insufficient to overcome the positive statement of defendant's witnesses, that on the day in question the deceased knew what he was doing and to whom he was giving his property. These witnesses describe the transaction clearly and distinctly. They are wholly disinterested and are unimpeached. Their account is uncontradicted by any direct. evidence to the contrary, and satisfies us of its truthfulness. The conclusion we have reached as to the facts of this case is sustained also by the rule of law, that proof of insanity, not habitual or permanent, but wholly due to the violence of disease, does not involve a presumption of its continuance; wherefore the party alleging it in avoidance of an act "must bring his proof of continued insanity to that point of time which bears directly upon the subject in controversy, and not content himself merely with proof of insanity at an earlier period." Buswell on Insanity, sec. 190; *Hall v. Unger*, 4 Saw. 672; *Hix v. Whittemore*, 4 Metc. 545; *Brooke v. Townsend*, 7 Gill (Md.), *loc. cit.* 31; *McMasters v. Blair*, 29 Pa. St. 298; *Staples v. Wellington*, 58 Me. 453.

The only insanity shown in the present case was temporary in its character. The burden of proof rested upon plaintiff, and could not be discharged without evidence of the insanity of the donor at the time of the making of the gift. The learned chancellor came to a different conclusion from that reached in this opinion by attaching undue weight to the inferences arising from the quantity of the gift. It is true the plaintiff parted with $1,500 of his estate, but he did not entirely strip himself of all means of support, for it is shown that even in the hands of his administrator the residue of his estate is about $944. If it be conced-

ed that such a donation was improvident, still improvidence alone can not supply the place of evidence of insanity. A variety of reasons consistent with sanity may have influenced the gift in question. Aside from the defendant, the only other natural object of the bounty of the deceased was a daughter by an unfortunate first marriage, born after the divorce of her parents, who bore the name of a subsequent husband of her mother, who probably never saw her father until her fifteenth year, and very seldom thereafter, and whose relations to her father were not shown to have been affectionate. Taking this status between father and daughter into consideration, and bearing in mind that the record shows a warm affection and much intimacy between the father and the defendant, who was his half sister, there was nothing unnatural in the selection of the latter as the object of the benefaction made by the deceased in his last illness, which he was possibly prompted to make for the purpose of putting the shares out of the reach of a maintenance suit brought against him by his second wife, and pending shortly before his last illness. Whether these or other motives may be inferred for the gift in question is immaterial, for it can not be annulled merely because it may seem to the trier of the facts to have been made without adequate motive.

The facts under the pleadings demonstrate that the gift sought to be set aside was validly made and fully executed. The judgment of the circuit court in favor of plaintiff will, therefore, be reversed and plaintiff's petition be dismissed without prejudice. It is so ordered. All concur.