RICHARD FRED JEUDE, Administrator of the Estate of ESTELLE CLAUS JEUDE, and RICHARD F. JEUDE, Her Husband, and RICHARD FRED JEUDE, Administrator *De Bonis Non* of the Estate of OTTO F. CLAUS, Appellants, v. MARIE K. EIBEN, EMMA EIBEN, WILLIAM G. EIBEN et al.—89 S. W. (2d) 960.

Division One, January 11, 1936.

*Taylor R. Young* and *Cullen, Fauntleroy & Edwards* for appellants.

*Brackman & Versen* for respondents.

PER CURIAM:—Richard F. Jeude brings this action in equity as administrator of the estate of Dr. Otto F. Claus to recover notes or

the proceeds thereof aggregating $15,000 and the title to a parcel of real estate all of which were transferred by Dr. Claus during his lifetime to Marie and Emma Eiben. The material allegations of the amended petition charge that Dr. Claus was mentally incapable of making a gift at the time of the transfers of the property involved; that he parted with his property as a result of flattery and false pretenses of love by Marie and Emma Eiben and the undue influence of the entire Eiben family; that the gifts to the Eiben girls were conditional upon marriage which was not consummated; that a confidential relationship existed between the members of the Eiben family and Dr. Claus which was exerted in procuring the transfer of the property to the girls; that a $12,000 note executed by Marie and Emma Eiben to Dr. Claus containing a provision that in case of the death of Dr. Claus it should be marked paid and canceled was testamentary in character, not properly executed as a will and hence was not effective to pass any right or interest in any unpaid balance to the defendants Marie and Emma Eiben. The answer admitted the transfer of the property, alleged that the notes and real estate were gifts to Marie and Emma Eiben and the members of the Eiben family in consideration of the love and affection Dr. Claus had for them; asserted that the $12,000 note was without consideration, never delivered, and was executed merely for the purpose of evidencing an understanding on the part of the Eiben girls to pay what they could; and denied generally and specifically the charges made in the petition. The reply was a general denial.

At the conclusion of the trial the case was taken under advisement. Later a judgment was entered dismissing plaintiff's bill. After unsuccessful motion for new trial plaintiff appealed.

Appellant advances five grounds for reversal of the judgment:

*First*, that the decree was against the great weight of the evidence and all the believable evidence. *Second*, that the greater weight of the evidence establishes the fact that Dr. Claus did not have mental capacity sufficient to make a valid gift at the time of the transfers. *Third*, that the property was obtained by means of flattery, false pretenses of love and undue influence. *Fourth*, that the gifts, although absolute in form, were made in contemplation of marriage, were therefore conditional and failed when there was no marriage. *Fifth*, that the $12,000 note was not a gift, but a will, and not being properly executed, the unpaid portion thereon should be declared a lien against the real estate conveyed to defendants by Dr. Claus, in the event the alleged gifts should be upheld.

The evidence presented by appellant discloses the following material facts: Mr. Jeude, the plaintiff, testified that he was forty-six years

old, a druggist, husband of Estelle Claus Jeude who died June 1, 1930, and who was the only child of Dr. Claus; that he thought Dr. Claus was about fifty-five or fifty-six years old at the time of his death; that Mrs. Claus died in 1920; that he married Dr. Claus' daughter in 1910 at which time Dr. Claus was "a stately, upright, honest, conscientious man" who had a great deal of determination, usually wanted his own way and ordinarily got it; that Dr. Claus had three operations, the first in 1914 for kidney stones, the second in 1917 to remove the kidney which was operated on in 1914 and the last in 1922 to remove a stone from the ureter. That the witness first noticed a change in the doctor after the first operation in 1914, when the doctor indicated the loss of "a little in the pep that he had had;" did not have as much interest in things after the operation as before and was not as tidy in his dress. After the second operation in 1917 the witness stated he noticed a vast difference; that the doctor lost seventy-five pounds in weight; would not talk to the witness and his wife (the doctor's daughter) more than five minutes when they went to see him; would frequently complain about being sick; on two or more occasions started talking about one subject, changed to another and then would forget what he was first talking about; would frequently compare his physical condition then to what it was when a young man; complained about headaches and not feeling well; tired easily; was petulant with his daughter and the witness; appetite was not as good as formerly; did not sleep well; did not dress as neatly as before the second operation; would say that he had headaches and thought he was losing his mind; would consult the witness about how to make up prescriptions, which he had never done before; complained of aches and pains in the side and groins which were about to set him crazy; seemed to be in pain and told the witness on one occasion that he had a hemorrhage and did not get any sleep for an entire week; said he had no hope of getting well; that after his wife died in 1920 no one cared for him and that the world was against him and that he was disgusted with life; denied to his daughter on one occasion in 1927 that he had bought any property for the Eiben girls and stated that his daughter would have everything he had; his eyesight was not as good as before; complained of buzzing in his head at times during the last four years of his life; when the witness and his wife would undertake to cheer him up he would say he would rather be left alone and on one occasion expressed the fear that someone was trying to get his money, but would not say who. Mr. Jeude stated that Dr. Claus began keeping a record of his investments in 1907 which was continued until January 15, 1929. That record was offered in evidence. It showed an increase in the doctor's investments from $60,962 to $79,563 in 1929, the latter amount including the notes aggregating $15,000 given

defendants. His stated liabilities decreased from $6700 in 1924 to $5800 in 1929. A part of the increase is accounted for as coming from an inheritance, the sale of real estate and possibly some insurance. The doctor showed this record to the witness and his wife the day he went to the hospital the last time and put them back in his safe at home. Jeude and his wife took the record from the safe while the doctor was in the hospital. On cross-examination witness states that at a meeting between the doctor, Jeude, his wife and the doctor's housekeeper, Mrs. Kisker, Mrs. Jeude asked the doctor whether he had given the Eiben girls any property. This the doctor denied. Mrs. Kisker had previously told Mrs. Jeude that he had. Later Mrs. Kisker told Mrs. Jeude that the doctor had given the Eiben girls some notes and deeds of trust. Thereafter every time the doctor went to visit the Jeudes Mrs. Jeude would ask him whether he had given the Eiben girls any property. He always denied that he had.

Dr. Leo Bartels stated that he has been a practicing physician since 1907; was associate neurologist at St. John's Hospital; knew Dr. Claus very well; operated on him first in 1919; had known him several years before that; took out one kidney in 1919, that the kidney had previously been operated on for the removal of a stone. Dr. Bartels attended him about six or eight weeks after he left the hospital until he had apparently entirely recovered from that operation. He operated on Dr. Claus again in 1922 for a stone in the ureter. At that time Dr. Claus was in the hospital about six weeks. After that Dr. Bartels treated him until about six months or a year before his death and ceased his treatments only when it became evident that Dr. Claus had heart trouble. The witness testified that Dr. Claus was "a very alert, live, wide-awake doctor and a power in his profession. Was looked up to as a very good physician." That he was sixty-five years of age at the time of his death. Commenting on the comparative condition before and after the various operations Dr. Bartels said that apparently Dr. Claus had recovered entirely after the operation in 1919, but that after the second operation he became childish, forgetful and fretful at times; that he could be easily swayed from an opinion; was worried about his condition and complained about it; offered to lend him money and buy him an automobile about two or three years after the second operation. Dr. Bartels did not charge him for either operation or for the treatments. During the period he treated him Dr. Bartels saw him twice a week part of the time and sometime did not see him for two or three weeks. He said that Dr. Claus gradually got worse in the last years of his life; that he did not remember things well, and was more childish. One incident referred to by Dr. Bartels and stressed by appellant is that Dr. Claus would unthoughtedly put his coat on before his vest as he was leaving

Bartels' office; that he was suffering from 1922 on; that Dr. Claus did not dress as well in the later years of his life; would continually say he was not going to get well and was ready to give up, but would be in a far different frame of mind after Bartels would assure him that he was improving and would ordinarily leave Bartels' office really convinced that he was going to get better. Dr. Bartels gave it as his conclusion that Dr. Claus was not of sound mind. He saw him last in 1928.

Dr. Simon testified that he had been in the active practice forty-one years, giving special attention to nervous and mental diseases. He did not see Dr. Claus and did not know him but testified to his conclusion from the description of his condition given by Dr. Bartels. Dr. Simon said that in his opinion, based upon those facts, Dr. Claus' had a condition known as senile dementia. "By that I do not mean that the man was insane. I am speaking not of an insanity but of a deterioration of the mind. . . ." That in his opinion a man in the condition that Dr. Bartels described Dr. Claus to be in could not measure up to the standards of an ordinary man in handling his own affairs.

Amelia Kisker testified that she was over forty years of age; began working at Dr. Claus' as a house girl in 1904; quit in 1915; went back in 1919 as housekeeper, and stayed until the doctor's death. She testified that before the doctor's first operation in 1914 he weighed about two hundred pounds, was strong, active, wiry and had a temper and a will of his own; that he was laid up about six weeks after the first operation and lost considerable weight; that he moved from his former home after his wife's death in 1920, and thereafter lived alone with the witness until his death, in 1929. She was not present when the second operation was performed; that she noticed a difference in his mental attitude when she went back in 1919; that the doctor was always tired and forgot to do things; complained about backaches and headaches, and would forget where he put his wearing apparel; would ask her where he put them, which he did not do in 1914; that he did not have as good appetite, was on a diet and did not like the diet. The doctor was in the hospital about four weeks after the last operation in 1922, and in bed at home approximately two weeks after his return from the hospital; that she waited on him at that time; that he was in better condition when he returned from the hospital in 1922, than he was when he returned in 1914; that about a year before his death he became careless about his dress; that she was present at a meeting between his son-in-law Jeude and his daughter Mrs. Jeude in Jeude's drug store in 1924, when he told the Jeudes that he had not given any property to the Eiben girls and that everything he had his daughter would get. She testified that this conversation

took place about three weeks after the Eiben family had moved into the home the doctor had bought them; that the doctor seemed a little angry when his daughter asked him about whether he had given the Eiben girls a home. Dr. Claus told her about giving the house to the girls and she had told Mrs. Jeude before this meeting. She stated that frequently Dr. Claus would take her to church on Sunday. She would go home with her sisters. He would go home with the Eibens; that he belonged to the Retail Druggists Association, the Kiwanis Club, the Social League Circle and the Masonic Lodge. On cross-examination she stated that with the exception of loss of weight and dress he was about the same the last year of his life as before; that he practiced up to the time of his death, but had fewer patients in the later years; that he had three the day he went to the hospital at the time of his last sickness; that the doctor invested $500 for her which Mr. Jeude refunded to her after the doctor's death. Evidently the doctor was looking after this money for her up to the time of his death as she said he regularly paid her interest on it.

Emma Eiben, one of the defendants, testified that she was thirty-nine years old; that the family consisted of her sister Marie, her brother William G., and her father Edward Eiben. Her mother died in 1927, after a long sickness. Emma managed the household budget. Her father was employed at $75 a month, her sister at $35 a week. Both of them turned over their wages to her. The brother did the same until his marriage. Emma paid all the bills, ran the house and took care of the invalid mother. She had known Dr. Claus since she was seven years old. He was the family physician. Treated her when she was a child. Called at their home many times professionally but never socially prior to 1922. After 1922 he began paying some attention to her and her sister Marie. On occasions Emma went to the office for medicine. She discontinued this in 1924, because Mrs. Kisker, the doctor's housekeeper, told her that Mrs. Eiben had called for her to come home when she knew her mother had not. (Mrs. Kisker, referring to the incident in her testimony, stated that someone did call but that she afterwards learned it was a boy's prank.). She said that the doctor began taking the Eiben sisters out in 1922. Ordinarily he took them both. They would go to church entertainments, symphony concerts, operas, shows, Kiwanis luncheons and ball games. At first these visits occurred about every two or three weeks, but as time went on the doctor spent more and more time at their home until during the last four or five years of his life he was at their home at least two or three times a week and almost always at their home or her brother's for Sunday dinner. A birthday in the family was celebrated by a dinner with the doctor always present. On his own birthdays he would buy chickens and take them to the Eiben home where they

would all have dinner together. Frequently her brother and his family were present. From 1923 up to the time of his death the doctor always gave Emma and Marie some present on their birthdays. It started with a $10 gold piece for Marie and $5 for Emma and gradually increased until on Marie's last birthday she was given $50. Dr. Claus would frequently "run over" to the Eiben's for an hour or two, explaining that he was lonesome at home. During the later years of his life he did not go to the trouble of making engagements to call on either of the girls. Neither of them had any other company. He was always welcome. In addition to the birthday presents, the doctor gave the family a radio about two years before Mrs. Eiben died, and a victrola and an electric washer in 1924. At the time of the making of these and other gifts Emma stated that the doctor said it made him happy to make others happy. She said that he was more attentive to Marie than to her. After the incident when Mrs. Kisker, the housekeeper, told her to come home the doctor told her that when any of them wanted him he would come over without charge. He had charged for his visits before that but did not charge thereafter. They always paid him for medicine. She said that one Sunday her mother was unable to get upstairs after going to church. When Dr. Claus heard of the incident he said that they should get another place where they could live downstairs. Emma told him they could not afford it. Later, in the latter part of 1923, when they were all at church together the minister in his sermon referred to "Christian giving." After the sermon the doctor said to them: "Why can't I do something like that for you folks?" He suggested that they look for a place to buy. She said: "Doctor, we can't think of anything like that." He replied: "Why not? According to the great Philanthropist I am blessed with this world's goods and why can't I do something like that?" After that they looked for homes, until they found the Greer Avenue property which they liked. He said he would buy it for them. Emma says that they (evidently meaning she and her sister) told him they could accept it only on one condition—that he would let them pay him some money they had in the bank and turn over to him the income from the property after the payment of the expenses on it. The Greer Avenue place was a two-family apartment. About two weeks later when the Doctor again brought up the subject the girls told him they wanted him to draw up a note, evidencing their understanding. He replied: "If you are so independent all right, but I am only doing this because you insist." He did not have the deed with him at the time. A few days later he brought the deed over to the house and said: "Emma here is the warranty deed and the clear title. The house is paid for and is yours and as far as that note is concerned you can tear it up. I am only doing this because you would not have it any

other way. You wanted to be independent.'' He had a blank note with him and filled it out in their presence. That note is as follows:

''12000.00                                  Saint Louis, Mo. June 17, 1924

''Five years after date we promise to pay to the order of Dr. Otto F. Claus Twelve Thousand Dollars, in sums of $720.00 or more per annum, payable December 29th and June 29th of each year thereafter. Privilege is hereby granted to renew said note or any part thereof for five years at expiration of said note. In case of death of said Dr. Otto F. Claus, this note shall be marked paid and canceled.

                                       ''Emma Eiben,
                                       ''Marie K. Eiben.''

''Value received.

She handed him the note but he would not take it. He said: ''Now after my death you need not show this to anybody because you have the deed to the house and the house is yours.'' He left the note with her and she has had it ever since. Neither of the girls had anything to do with negotiations for the purchase of the property. The note had a number of payments listed on it, the first one for $676. Emma testified that the credits were all entered on the note by the doctor in their home and represented money that they turned over to him under their agreement. The first payment she says was made with money realized on a matured insurance policy belonging to her father. The other payments were from rent on the upper story of the property and small sums that she added from the family income. They moved into the house July 3, 1924, and have lived there ever since. The total amount of payments on the note is $4726.70. She says that in June, 1927, the doctor gave them some notes and deeds of trust. The incidents leading up to this transaction are described by her as follows: One evening early in June when the doctor was at their home he got out a note book which he said listed securities that he owned and said that he was going to give her some of them. She says she indicated no interest and the doctor said that she was acting just like Marie had. A few days later he brought some deeds of trust over to the home and told her that he had brought the deeds of trust that he was going to give them. Her mother was present at the time. Emma said: ''Doctor, I do not want them. You have a daughter.'' He said: ''Is that how you appreciate the gift?'' She replied: ''Doctor, you don't understand. You have a daughter.'' He said: ''I do understand. Don't you worry about Estelle, she will be well taken care of. And this is my money and I can do with my money what I want.'' He then said to Mrs. Eiben: ''I want these girls to have these deeds of trust. You know I get into many a home, and few that I get into like this. Where will you find a girl like Marie, earning thirty-five a week and turning over every cent of her money, and

not once complaining 'What do you do with it?' or complaining about not being able to have things. Where will you find a girl like Emma, who has given up all her service all these years and not once complaining about the task she has to do. I never come over here but what she hasn't a smile; no matter what I tell her to do for you, she does it willingly. Where will you find a girl that will give up everything to take care of her mother.'' That the mother cried and the doctor told Mrs. Eiben: ''The Lord has given you a cross to bear Mrs. Eiben but he has blessed you with happiness. You have a faithful husband. He never complains about doctor's bills or anything like that, and children who will do anything for you. That is more than money can buy. You are more richly blessed than I; for I only have one daughter, and for her to spend a nickel to hear her father's voice over the phone is too much.'' He explained that Estelle did not call him because she said it cost her a nickel. The notes and deeds of trust were turned over to Emma at that time. She put them away until that evening when the doctor explained them to her and Marie. The notes consisted of a $7500 note, a $4500 note and a $3000 note, all secured by deeds of trust. The $7500 note later became due and was exchanged by Dr. Claus in 1928 for three others totaling $7500, which he delivered to them. Emma stated that one of the reasons given by the doctor for giving them the deeds of trust was that her father should quit work. He was earning $75 a month. The doctor told them the income from the $15,000 would equal Mr. Eiben's salary and he would not have to work. Mr. Eiben would not consent to that. She says that the girls had an understanding with the doctor that he was to collect and retain the interest on these notes as long as their father continued to work. Dr. Claus frequently deposited the rent money and other money belonging to the family to their account at the bank for them, taking their bank book with him for that purpose and returning it later. At the time of his death the doctor had their bank book. It was never returned to them. The insurance expired on the flat before the doctor's death. They gave the doctor the money to renew it and he attended to it for them.

William G. Eiben, brother of Marie and Emma, testified he had known Dr. Claus since he (William) was six years old; that after his marriage the doctor was his family physician; that the doctor was invited to his home for Sunday dinner every other Sunday during the last few years of his life. The witness was not present when the deed to the house was given to the sisters. He said the doctor told him in 1927, after Mrs. Eiben's death that he had given the sisters a home. Neither was he present when the deeds of trust were given his sisters, but the doctor told him he had given the girls some securities so that the father could quit work. After the death of Dr. Claus'

in 1929 the witness received as a gift from his sisters a deed of trust for $4500, which he foreclosed, bought the property in and thereafter placed a mortgage on it for $4000, with which money he bought a lot where he was living in St. Louis County. He also borrowed $3000 more from his sisters for which he gave his note. The note has not been paid. He is not paying interest on it. He says that between 1920 and 1929 the doctor drove his car regularly, went to entertainments frequently, to church every Sunday morning and that his physical condition was "A1." He says that the doctor wanted to pay Mrs. Eiben's funeral expenses but was not permitted to do so; that the doctor seemed to be very fond of his sisters but that he had never seen him "hug or kiss" them.

Mrs. Tillie Silverman testified that she helped her husband in his business which she described as a "poultry place;" that the doctor came there every week or two; was not their physician but an intimate friend for five or six years prior to his death. She described Dr. Claus as a very fine man, upright, plenty of good sense and frequently told her when he purchased chickens from her that he was buying them to take to the Eiben home for a birthday party, sometimes his and sometimes the birthday of a member of the Eiben family. The doctor told her that the Eibens, whom she knew, were very good to him and that their home was really all the home he had.

Otto N. Schwarz testified that he was in the real estate business and had formerly been with the Wanstrath Realty Company; that the doctor was a client of Wanstrath from 1907 until his death. The witness stated he had known deceased since 1907, from which time Dr. Claus had frequently bought deeds of trust through that office; that the doctor was a very sensible, alert man. He noticed no difference in his mental condition as the years went on. Dr. Claus selected securities from the list which the office kept. The witness did not recall when the doctor was at the office last, but remembered seeing him and talking to him on the street five or six months before his death. In his opinion the doctor had a sound mind and knew his business and what he was about. This witness's memory about the dates of transactions he had with the doctor was very hazy, and evidently incorrect in at least some particulars. He says the doctor told him that he wanted to marry one of the Eiben girls, but that she insisted that he join their church, which he would not or could not do.

George A. Dorenkamper, a real estate agent employed by Wanstrath from August, 1922, to October, 1924, knew Dr. Claus and had Dr. Claus for his physician in 1926 and 1927. The doctor attended Dorenkamper's wife at the time of the birth of their child in 1926.

Mrs. Emma Drewes, mother-in-law of William G. Eiben, knew Dr. Claus as a boy, but had lost track of him from that time until

1919, after which she had him regularly as a family physician. The last treatment he gave her was in the winter of 1928. She states that she did not see much difference in Dr. Claus in the latter years of his life; that he was cheerful at all times and in her opinion was of sound mind; that she saw him at church every Sunday and at family gatherings during the last six or seven years before his death. Twice a month the doctor came to her son-in-law's home for Sunday dinner. She lived with the son-in-law. Shortly after the Eibens moved to the Greer Avenue house Dr. Claus told her that he had turned the papers to the house over to the Eiben girls; that he first thought he would give it to the whole family, then decided that the girls were better able to take care of it.

Dr. William Aufderheide testified he was a practicing physician for more than thirty-three years prior to the date of the trial; was engaged in general practice and had known Dr. Claus for forty years or more. His relations with the doctor were mostly social and rather intimate. Witness saw him several times a month in the later years of the doctor's lifetime; saw him about a week before his death at the hospital; knew of the various operations Dr. Claus had; noticed no substantial difference in his general appearance, conduct or general health after the operations. He said the doctor was cheerful at all times; was very active in Kiwanis Club affairs and a trustee of the club; belonged to the Retail Druggists' Association; attended frequent meetings of the Kiwanis Club and Druggists' Association up to the time of his death. In his opinion Dr. Claus was a man of sound mind at all times. He stated that the relationship between Dr. Claus and his daughter Mrs. Jeude after the death of Mrs. Claus was "very mutual" but that the doctor deplored the fact that his daughter and son-in-law would not come to live with him after his wife died. Aufderheide said the relationship between Dr. Claus and Mr. Jeude was not at all strained.

Bernard A. Spaeth, a retail druggist, testified that he had known Dr. Claus since 1919; that he saw him as often as two or three times a month during the later years of his life; that the doctor attended the Kiwanis Convention at Sedalia in June, 1928, and took an active part in the affairs of the convention at the time; that there was no noticeable change in the doctor during the later years of his life and that in his opinion Dr. Claus was a man of good, sound mind; that the relationship between Dr. Claus and his daughter seemed to be cordial and pleasant.

P. J. Stremmel, general superintendent of the Granite City Steel Company testified as follows: That he had known Dr. Claus more than thirty-five years; that he was their family physician for years and up to the time of his death; he saw the doctor last about six weeks

or two months before his death; that the doctor was the family physician at the time of the birth of Mrs. Stremmel's three children and later at the birth of his grandson in 1926. Dr. Claus treated the witness about six weeks before his death; was always careful in giving instructions about medicine to patients; seemed thoroughly familiar with his business and always seemed to be of sound mind and cheerful.

Tillie Imhof testified that she and her husband were formerly in the baking business; had been out of business for six years; had known Dr. Claus and the Jeude family for more than thirty years; that Mrs. Jeude called her the day the doctor was preparing to go to the hospital at the time of his last sickness and invited her to come down to see the doctor; that she went that day. The doctor seemed cheerful, prescribed for her son, wrote the prescription and filled it; that the doctor lost some weight in the last few years but was, in her opinion, of sound mind up to the time of his death; that the doctor told her in the presence of his daughter a short time after the death of Mrs. Claus that he did not want to get married. He seemed to think a great deal of his daughter.

Edward Eiben, the father of Marie and Emma, testified that Dr. Claus told him he had given the girls some deeds of trust. Mr. Eiben was not present at the time of the gift. He did not pay much attention to their affairs; he said the doctor wanted him to quit work, and offered to pay his wages if he would. Mr. Eiben would not accept. The doctor called him a "stiff neck" for not taking it. Later he did quit work and the girls used the income from the notes to take the place of his salary. He said that Dr. Claus had been their family physician since 1908; that after he started to take the girls out he usually took both together; that Dr. Claus was the only gentleman friend the girls had.

Rev. Louis J. Sieck testified that he was a minister of the Lutheran Church at Twenty-first and Benton streets in North St. Louis and had been for twenty-six years; that he had known the Eiben family for that length of time; that the Eibens were very faithful churchgoers and lived about 300 feet from the parsonage until they moved to Greer Avenue; that the girls had a character "without reproach;" that he had known Dr. Claus for about twenty years; that from 1924 until his death the doctor was a regular attendant at his church but was not a member; that he had many conversations with him; that the doctor was a man of sound mind, memory good, knew what he was about and was not easily led; that the doctor told him at the time of Mrs. Eiben's death that he appreciated the home life he enjoyed at the Eiben home very much. Witness called on Dr. Claus February 8 and 13, 1929, on which occasion the doctor's mind was entirely clear; that he called to see him at the hospital on February 22, 1929, the day he died, but was not admitted; that the doctor once told him

he would have married one of the girls but that she declined. Claus told him that he had a great affection for the Eiben girls and the entire family. Frequently Dr. Claus came to his church with his housekeeper, Mrs. Kisker.

Marie Eiben, one of defendants, testified that she was forty-two years of age. Had known Dr. Claus since she was twelve. He waited on her as her doctor. She had not gone to his office after the doctor began calling at the home socially in 1922. She had been employed as a milliner since 1920; turned over all her salary to Emma, who was the banker of the family; that the first time Dr. Claus ever paid her any particular attention was in 1922 when he asked her if he could take her to the opera. Up to that time the doctor had never visited in their home socially, but had been there many times professionally. After that they went out frequently together to the opera, picture shows, banquets, Kiwanis luncheons, dinners and ball games. Ordinarily Emma went also. At first, the doctor came to see her about every two weeks. His visits gradually became more frequent until during the last few years of his life he came over several times a week; that he was at their home frequently for dinner, visited other members of her family and went to church with them regularly; that his first gift to her was at Christmas, 1922, when he gave her a $10 and Emma a $5 gold piece. After that every birthday and Christmas she received a gift from him. The amount increased gradually, the last being $50. She stated that the doctor proposed marriage to her first about a year after they moved into the new house. That she declined. The subject of marriage came up between them several times thereafter. On each occasion she refused to marry him. She said the doctor frequently called her and Emma "honey," on numerous occasions put his arm around her and sometimes kissed her in the presence of the family. The doctor told her he wanted to give them a home and that a Christmas sermon on "Christmas giving" had put the idea in his mind; that after the subject had been discussed in their home several times they began looking at homes. She objected to the doctor giving them a home, because he had a daughter to consider; that the doctor said: "You will think it strange I am doing this for you instead of my daughter, but, I want to tell you something. Mr. Jeude thought I should be giving them more than what I have been giving them and Estelle said, 'You have married me and you are going to support me, and not my father.'" She says that the doctor told her at that time that Jeude had at one time threatened to sue him for alienating his wife's affections. Mr. Eiben, Emma, Marie and the doctor looked at houses together. They selected the Greer Avenue house. She and Emma said they would not accept it unless Dr. Claus would let them pay him what money they had and take the income from the place after expenses were paid; that the doctor said: "Well if you insist

on being so independent all right, but I am only doing this on that account;'' the doctor later came to their home with the deed; the family was in the dining room; the doctor laid the deed on the table saying: ''This is yours, the house is free and clear.'' The doctor then wrote the $12,000 note and the girls both signed it. At the time they signed the note he had already given them the deed. After the note was signed when Emma undertook to give it to the doctor he said: ''I do not want this. That is yours. You can tear it up right now if you want. I am just doing this because you want to be so independent'' and would not take it. Emma put the note away. The original note is not before us, but evidently it was on a printed form, as she testified that the words ''value received'' were stricken out of the note by the doctor before it was signed. She said the first mention of the gift of the notes and deeds of trust was in June, 1927, when he told them one evening that he was going to give them some deeds of trust; that she did not pay much attention to it at the time. She described the delivery of the notes and deeds of trust in the following language: ''The first thing he said was, 'Did Emma tell you I was over this morning and brought those deeds of trust?' I said, 'Yes,' and tears came to my eyes, and he said, 'We won't say anything more about it now. When I brought them over this morning your mother cried.' So he said, 'We'll wait until later on.' So later on in the evening—dad retired early and mother retired, I guess, about nine, and after that he said, 'Emma, get those deeds of trust now, I want to show them to Marie.' So she did and gave them to him and he spread them out on the kitchen table, and I said, 'Doctor, we do not want these.' I said, 'You have a daughter.' He said, 'What! Is this the way you are going to appreciate my gift?' He said, 'I want you girls to have these. You will appreciate more what I do for you than Estelle will with all that she gets.' And he said, 'She doesn't think this much of me,' and he showed he was very much hurt. And then tears came to my eyes and I cried and he put his arm around me and said, 'Don't cry; I want you to be happy. I thought I would make you happy by doing it.' '' She said that when the notes were given to them the doctor said: ''Now the income from these deeds of trust will amount to about your father's salary and try and persuade him to give up his work.'' That she said: ''We couldn't do that because we have tried to before.'' He said: ''Well, I am going to try and talk to him.'' Marie: ''Well, I know you won't persuade him, and we won't accept these deeds of trust unless you accept the interest until Dad does give up his work.'' She said that the doctor collected the interest and retained it.

Defendants offered in evidence the original petition. Its only significance lies in the fact that it did not contain an allegation of unsoundness of mind.

In rebuttal plaintiff offered the depositions of Marie Eiben, Emma Eiben and Edward Eiben, taken before a special commissioner on December 13, 1930, for the purpose of impeaching the testimony of those three witnesses. There are discrepancies between the deposition and the testimony of the witnesses at the trial but these discrepancies are not of such serious consequence as to merit general discussion. It appears from the deposition that the existence of the $12,000 note was not known to the appellant until the taking of the deposition at which time it was produced by respondent at appellant's request. Evidently the notes given to the Eiben sisters were made payable to bearer.

Appellant in his first assignment asserts that the decree was against the weight of the evidence. Consideration of this general question will be deferred until after the determination of those which are more specific.

Appellant contends that Dr. Claus was mentally incompetent to make a valid gift subsequent to 1922. In support thereof he cites Huls v. Lawrence (Mo. App.), 300 S. W. 1004, decided by the Kansas City Court of Appeals. In that case a gift was held invalid on the ground of insufficient mental capacity but an examination of the facts stated therein discloses an almost total dissimilarity with the facts before us. However, the court used as its guide in that case a definition of competency taken from Sehr v. Lindemann, 153 Mo. 276, 54 S. W. 537, decided by this court which is very applicable to the facts in this case. In the Sehr case, l. c. 288, we said:

"By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. (Cases cited.) Mere opinions of witnesses that the testator was 'childish,' or acted 'funny,' or was 'worse than a child,' or that there were 'inequalities in the will,' unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.' " [Sehr v. Lindemann, 153 Mo. 276, 288, 54 S. W. 537, 540.]

Without again reviewing the evidence it is sufficient to say that, using the above definition of competency as a criterion, under the facts in this case Dr. Claus had sufficient mental capacity to make a valid gift on the dates of the transfers of the property involved. The other cases of Williams v. Peterson (Mo. App.), 271 S. W. 1016; Reed v.

Carroll, 82 Mo. App. 102, and Richardson v. Smart, 65 Mo. App. 14, cited by appellant are not applicable to the facts in this case.

■ Was the property involved obtained from Dr. Claus by means of flattery, false pretenses of love and undue influence?

Appellant asserts that where it is shown that a relation of special trust and confidence exists between the parties, a gift to the party in the ascendancy is prima facie void. Respondent concedes this general proposition of law but insists it is not applicable under the facts in this case. We said in Hershey v. Horton, 322 Mo. 484, 15 S. W. (2d) 801, that, because of the great variance between facts in different cases, it is difficult, if not impossible to deduce any hard-and-fast rule from the decided cases as to when a fiduciary or confidential relationship will be said to exist. Judge Atwood quoted with approval from Studybaker v. Cofield, 159 Mo. 596, 612, 61 S. W. 246, 250, as follows:

"The law is as cautious in defining a fiduciary relation in the sense in which we are now using that term as it is in limiting by definition the boundaries within which fraud may be pursued. There are certain technical relations that are readily comprehended as fiduciary, such as guardian and ward, attorney and client, priest and communicant, etc., but there are other relations not falling in either of those specified classes that are in fact fiduciary, and, conversely, it is not every guardian, attorney or priest, quia eo nomine, who is to be adjudged to hold a fiduciary relation with the party in regard to a particular subject. It is in each case a question of fact. The law regards the real rather than the nominal condition. The principle is thus stated in 27 Am. & Eng. Ency. of Law, 460: 'The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations that exist whenever one trusts in and relies upon another. The only question is, does such a relation in fact exist?' While the relation of nurse and patient may raise the question, yet it does not in itself answer that question, but the inquiry is still one of fact. Was trust reposed?"

The evidence undoubtedly shows that Dr. Claus had a strong affection for the entire family and particularly the two girls. It is undisputed that he was especially fond of Marie and asked her to marry him on several occasions. That Dr. Claus had a deep sympathy for the invalid mother and the father who was working hard and uncomplainingly in the declining years of his life seems equally clear. But affection and sympathy created by the wholesome attention and companionship of friends of years standing does not create a fiduciary relationship in the sense that term is used here. [McKissock v. Groom, 148 Mo. 459, 50 S. W. 115; Jones v. Belshe, 238 Mo. 524, 141 S. W. 1130.] To raise the presumption of undue influence it must be further shown that the relationship is one which could have been improperly

used to warp the judgment of the benefactor. We find no such condition reflected by the testimony in this record. For that reason Mc-Clure v. Lewis, 72 Mo. 314, cited by appellant, is not in point.

It is asserted by appellant that if Dr. Claus was not engaged to one of the Eiben girls, then the conclusion is irresistible that their relations were illicit. Assuming his conclusion to be a fact appellant says that the existence of an illicit relationship raises the presumption of undue influence. We find no evidence in this record which justifies us in assuming that an illicit relationship existed between Dr. Claus and either of the Eiben sisters.

Appellant contends that the gifts were made in contemplation of marriage, were therefore conditional and failed when there was no marriage. Counsel cites Lumsden v. Arbaugh, 207 Mo. App. 561, 227 S. W. 868, an opinion by Judge BRADLEY in which the court said:

"If the piano was given to defendant by plaintiff in contemplation of marriage, and she broke the engagement for no fault of plaintiff, then he can recover. We find no case in our State directly bearing on this class of gifts. In 14 A. & E. Encycl. of L. 1045, we find this statement of the law on gifts made in contemplation of marriage; 'A gift to a person to whom the donor is engaged to be married, made in contemplation of marriage, although absolute in form, is conditional; and upon breach of the marriage engagement by the donee the property may be recovered by the donor. But if the gifts are made simply for the purpose of introducing the donor to the donee's acquaintance, and to gain her favor, the property is not recoverable although marriage does not ensue.' "

The weakness of appellant's position lies in the fact that here there was no engagement to marry. The testimony is that Dr. Claus did not propose marriage to Marie the first time until long after the conveyance of the Greer Avenue property, when she refused him and that although he proposed to her several times thereafter, each time she refused him. The case cited therefore supports the validity of the gifts.

The testimony relating to the delivery of the notes and deeds of trust shows that these securities were taken to the Eiben home by Dr. Claus in June, 1927, turned over to Emma in her mother's presence and on the same evening explained to both Emma and Marie, after which Emma put them away. The notes were made to bearer and hence needed no endorsement. There was therefore an actual, completed gift in praesenti. The actual possession and control of the securities having irrevocably passed from Dr. Claus to the donees, the arrangement that the donor should receive the interest from the notes until Mr. Eiben retired did not change the nature of the transaction.

Appellant makes the further point that the note of June 17,

1924, is a valid and existing obligation due the estate of Dr. Claus. The facts surrounding the execution of this note, if it be a note, briefly reviewed are as follows: Dr. Claus was giving the two girls the Greer Avenue property. He purchased it and had the deed made from the owner to Marie and Emma Eiben. He took the deed to the Eiben home and delivered it to Emma and Marie. Previously in the discussion between Dr. Claus and the entire Eiben family relative to him giving them this home the girls had insisted that they could not accept the gift unless he would permit them to give him some money they had of their own and the rents from the property after deducting the expenses. The record shows that at the time he actually brought the deed over to the house and delivered it he was reminded of this condition and whereupon he said: "All right if you want to be so independent. But I am only doing this because you insist on it." He had with him a printed form of note. This printed form had the words "for value received" in the body of the note. These words Dr. Claus struck out. He filled out the note for $12,000 which was the purchase price of the property. The note has been set out in full and, it will be noted, carried a provision that it should be marked "paid" on the death of the doctor. The undisputed evidence is that Dr. Claus would not take the note after the deed was delivered but when it was handed to him by Emma said: "No, that is yours. I am only doing this because you wanted to be so independent. You can destroy the note now if you like." The record further shows that he advised them to say nothing about the note and that if they did not destroy it then they should destroy it upon his death. At the time the note was executed and the conversation above related took place a payment of $676 was noted on the back of the note. This represented some money that Mr. Eiben had, arising from the maturity of an insurance policy on his life. Many other credits are shown to have been entered upon the back of the note. The space on the back of the note was evidently not sufficient for all of the credits as there was also produced at the time of the taking of the depositions of the defendants prior to the trial some blank rent receipts with further credits written on the back of those rent receipts. All these credits, including the initial one, were made in the handwriting of Dr. Claus. The note never left the possession of the respondents.

Under these facts appellant seeks to invoke the doctrine laid down in Sheppard v. Wagner, 240 Mo. 409, 1. c. 432, 144 S. W. 394, where it was held by this court that a deed absolute on its face, made by the owner of real estate which was about to be foreclosed and upon which taxes were due and unpaid, to his stepdaughter, was in fact a mortgage because it was shown that at the time of the making of the deed a contract was entered into between the grantor and the grantee under the terms of which contract the grantees were to pay the in-

terest on the mortgage which was about to be foreclosed, the taxes on the property, and were to have the use of the premises for doing so. In addition, the grantees were to make such repairs as might be necessary and the grantor was to have the right at any time within three years to redeem the property by paying to the grantees the amount they had paid out on account of taxes and interest. The contract in the Sheppard case contained a clause which provided in effect that if the grantor did not exercise his right to redeem within three years or if he should die before the expiration of three years without redeeming, the right to redeem should terminate. The grantor died without redeeming. It was held that the facts and circumstances indicated that the deed, although absolute on its face, was in fact a mortgage, that a mortgage having been created it was always a mortgage and the right of redemption could not be forfeited by the clause in the contract but could only be terminated by foreclosure in court or settlement between the parties. In the discussion of this principle in the Sheppard case it was forcibly pointed out that one of the primary requisites to the construction of an absolute deed as a mortgage was an existing obligation on the part of the grantor to the grantee, the creation of such an obligation by the transaction, or an obligation to arise in the future. Such an obligation is entirely lacking in this case. Dr. Claus owed the Eibens no money at the time of the delivery of the deed. By the delivery of the deed he did not create any debt owing from him to them and there is no suggestion in the record that any of the parties contemplated the existence of any pecuniary obligation on his part to the Eibens at any time in the future. Therefore the deed to this property could not have been made to secure the doctor's debt to the Eiben girls because none existed. But appellant seemingly insists that the note, irrespective of its connection with the deed and regardless of whether the deed was absolute or a mortgage, created an obligation on the part of Marie and Emma Eiben to Dr. Claus and that since the entire principal of the note had not been paid at the time of the doctor's death the obligation now exists to pay the balance to the estate. If the note ever became valid as such and the usual responsibilities and obligations existing between a maker and the payee of the note was created, then we are inclined to the view expressed by appellants that the provision in the note that it should be marked paid and canceled upon the death of the doctor was testamentary in character and inoperative. But was the note, as it was called and as we have referred to it, actually a note? It is undisputed that after it was signed and held out to the doctor by Emma Eiben that he would not take it and said that he did not want it, that it was theirs and they could tear it up then as far as he cared, or words to that effect. As we understand the rule, this did not constitute such a delivery of the instrument as would make it a binding

obligation. If there was not a binding obligation then there could be no release of that obligation by the clause in the instrument providing that it should be marked "paid" upon his death. The cases cited by appellant holding, in effect, that the clause above referred to made the instrument testamentary in character and invalid since it was not executed with the formality required for the making of testamentary devices, are not in point. The evidence as a whole convinces us that it was the intention of Dr. Claus to give the Greer Avenue property to the respondents Emma and Marie Eiben without any condition attached to the gift and that the payments made by the Eiben sisters to Dr. Claus evidenced by the notations on the back of the instrument above referred to and the blank rent receipts were entirely voluntary and accepted by Dr. Claus not as a condition to the making of the gift but merely to satisfy the wishes of the donees.

We agree with appellant that evidence to support a gift must be clear and conclusive. Especially is this true when the gift is not asserted until after the death of the alleged donor. [Reynolds v. Hanson (Mo. App.), 191 S. W. 1030; McCune v. Daniels, 225 S. W. 1020; 28 C. J. 676, sec. 82.] The reason and necessity for the careful observance of the rule is fully explained in Foley v. Harrison, 233 Mo. 460, l. c. 581, 136 S. W. 354. It is earnestly insisted and ably argued that the evidence in this case did not measure up to that standard. It is unnecessary to again review the evidence in detail. We note, however, that in this case there was no apparent concealment of the gifts on the part of any one except Dr. Claus to his daughter. The Greer Avenue house was purchased by Dr. Claus who handled all the negotiations and had the deed prepared. The deed was made direct to Marie and Emma Eiben, recorded, and the Eiben family had been living in the property five years before the doctor's death. The notes and deeds of trust were delivered to the donees in June, 1927. All of the members of the Eiben family knew about it. Dr. Claus told Mrs. Emma Drewes and Otto N. Schwarz. He also told Mrs. Kisker, his housekeeper, who in turn told Mr. and Mrs. Jeude. Although Dr. Claus consistently denied to his daughter that he had made any gifts to the Eiben girls yet from the testimony of Mr. Jeude the inference is strong that the father knew his daughter would not approve the making of the gifts. She had been told about it by others and was continually pressing him for an admission. It is not an unreasonable assumption that Mrs. Jeude's actions, however proper they may have been, may have been responsible to a large extent for the doctor's petulant attitude toward Mr. and Mrs. Jeude in the later years of his life. He was evidently lonesome and desired companionship. He found it in a family he had known for many years. He spent his Sundays with them, took the girls out frequently, practically became a member of the family until as he expressed it to

Mrs. Silverman "that was really all the home he had in the world." In our judgment the finding of the chancellor was correct. The judgment is affirmed.